UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SABRINA CHIN, on behalf of herself and all
others similarly situated,

                              Plaintiff,

        -v-

RCN CORPORATION,

                              Defendant.

```
┌─────────────────────────────┐
│ USDS SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #: _____      │
│ DATE FILED:  5/4/10         │
└─────────────────────────────┘
```

No. 08 Civ. 7349 (RJS) (KNF)
ORDER

RICHARD J. SULLIVAN, District Judge:

        The clerk of the court is respectfully directed to docket the attached objections, which were

submitted *pro se* by class member Mark Lyon.  Furthermore, IT IS HEREBY ORDERED THAT,

by May 28, 2010, the parties shall submit a response to these and any other objections that are

submitted before that date.

SO ORDERED.

DATED:        May 3, 2010
              New York, New York

                                        _____
                                        RICHARD J. SULLIVAN
                                        UNITED STATES DISTRICT JUDGE

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SABRINA CHIN**, on behalf of herself and all others similarly situated,<br><br>       Plaintiff,<br><br>   - against -<br><br>**RCN CORPORATION**,<br><br>       Defendant. | Civil Action No. 08-CV-7349 (RJS)(KNF)<br><br>**OBJECTION TO CLASS ACTION SETTLEMENT AGREEMENT** |

COMES NOW, Mark Lyon, class member, and enters his objection to the terms and conditions of the Settlement Agreement proposed by Sabrina Chin and RCN Corporation and gives notice of his intent to personally appear at the fairness hearing scheduled for June 4, 2010.

As outlined in additional detail below, Mark Lyon objects to and opposes the proposed settlement for two basic reasons. First, the settlement violates fundamental tenets of fairness and adequate representation because the principal benefit obtained by the named representatives is a short-term, self-imposed "time out" period by Defendant of the behaviors complained about by Plaintiff. Second, class counsel have signaled their intention to pocket grossly excessive fees for their secret work procuring a settlement designed primarily to absolve Defendant of future liability for resuming the exact behaviors complained about as early as November 1, 2010.

Under the proposed settlement, only one class member receives any significant compensation. Approval of this settlement on the terms proposed by the parties would actually *harm* the remaining class members by binding absent class members to worthless, already-expired injunctive relief. These class members would not receive real or imagined benefits. To extinguish their claims in exchange for injunctive relief of no economic value is neither fair nor reasonable.

The burden of establishing the fairness of the settlement rests squarely on its proponents. Newberg on Class Actions, ¶ 11.42 (3d ed. 1992). The settling parties have failed to put forth on the publicly accessible record any significant evidentiary or other support for the settlement. Accordingly, Mark Lyon reserves the right to supplement these objections after review of any further submissions by the settling parties in support of their proposed settlement.

## <u>INTRODUCTION</u>

Mark Lyon is an adult resident citizen of New York County, New York. On or around November of 2008, he entered into an agreement with RCN Corporation for Internet and Cable Television services at his apartment within New York City.

Mr. Lyon's apartment building is served by two cable providers, Time Warner and RCN Corporation. After reviewing information about both providers, including reviewing information on each provider's website, he selected RCN Corporation

under the belief that they offered superior services[1]. He remains an Internet and

Cable Television customer of RCN Corporation to this day.

On Monday, April 19, 2010, Mr. Lyon received actual notice via email of the

pending settlement in this matter. Until that time, Mr. Lyon was unaware that this

action was pending, even though he closely monitors similar actions through major

Internet news sites as a result of his interest in Network Neutrality[2].

As defined in this Court's Order Adopting Report and Recommendation (Doc.

No. 40.), Mark Lyon is a member of the class. He has not and does not desire to opt

out of the settlement class. This action, however, proposes to extinguish his and all

other class member rights against Defendant and a large number of parties not

named in this action with regard to all causes of action that are or <u>could be</u> alleged

in this action in exchange for a short, expired period of injunctive relief against

RCN Corporation. Therefore, he is obliged to object to the proposed settlement

terms. (Doc. No. 31-2 and 37-2.)

---

[1] During this period, Time Warner Cable announced testing of incredibly restrictive bandwidth (usage) caps in Austin, Texas. *See* http://gigaom.com/2008/10/21/time-warner-cable-talks-last-mile-and-bandwidth-caps/ (last visited April 27, 2010). Because Mr. Lyon makes significant use of his residential Internet connection for web browsing, VPN Tunneling, downloading and uploading of large files, streaming video and Voice Over IP (VOIP) telephone service. His most significant concern in selecting a provider was the availability of an unmetered and unfiltered connection.

[2] "Network neutrality … is a principle proposed for user access networks participating in the Internet that advocates no restrictions by Internet Service Providers or governments on content, sites, or platforms, on the kinds of equipment that may be attached, and on the modes of communication allowed … [A]dvocates of net neutrality and associated rules have raised concerns about the ability of broadband providers to use their last mile infrastructure to block Internet applications and content (e.g., websites, services, protocols), particularly those of competitors." Wikipedia, *Network Neutrality*, http://en.wikipedia.org/wiki/Network_neutrality (last visited April 30, 2010). As a practical matter, the principles of network neutrality prevent providers like RCN who offer services such as VOIP from degrading the same services when offered by a competitor. Such actions would create artificial barriers that would drive customers to the Internet Provider's services, even though the same or better services could have been obtained elsewhere.

<u>ARGUMENT</u>

1. **THE SETTLEMENT VIOLATES FUNDAMENTAL TENETS OF FAIRNESS AND ADEQUATE REPRESENTATION BECAUSE THE PRINCIPAL BENEFIT OBTAINED BY THE NAMED REPRESENTATIVES IS A SHORT-TERM, SELF-IMPOSED "TIME OUT" PERIOD BY DEFENDANT OF THE BEHAVIORS COMPLAINED ABOUT BY PLAINTIFF.**

"Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mabon*, 957 F.2d 697, 701 (9th Cir. 1992). Accord *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 23 (2d Cir. 1987) ("district court ha[s] a fiduciary responsibility to the silent class members"). "Because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004). See also *Diaz v. Trust Territory of Pacific Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989) ("The district court must ensure that the representative plaintiff fulfills his fiduciary duty toward the absent class members").

Where a court is confronted with a settlement-only class certification, the court must look to factors "designed to protect absentees." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003). "Settlements that take place prior to formal class certification require a higher standard of fairness." *Molski*, 318 F.3d at 953 (quoting *Dunleavy v. Nadler*, 213 F.3d 454, 458 (9th Cir. 2000)).

"These concerns warrant special attention when the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998).

## A. THE PARTIES HAVE FAILED TO DEMONSTRATE THE FAIRNESS OF THE PROPOSED SETTLEMENT AGREEMENT.

Plaintiff goes to great lengths in her Memorandum of Points and Authorities in Support of the Plaintiff's Unopposed Motion for Preliminary Approval of Settlement (Doc. No. 30.) ("Plaintiff's Memo") to paint the proposed settlement as "significant for both average consumers, who will now receive the service promised, as well as more technically sophisticated users who invent and explore new applications on the Internet to further advance the development of technology and human innovation." Actual class members, however, will find that the settlement falls far short of these claims.

Indeed, the terms of the Proposed Settlement Agreement (Doc. No. 31-2 and 37-2) ("PSA") call for two concurrent eighteen-month periods of time where RCN Corporation will not interfere with consumer P2P and Non-P2P Internet traffic. Unfortunately, by the time the settlement can be approved, those periods will have expired. Instead, the class will receive no future compensation and RCN Corporation will be free to continue advertising and marketing their services in a manner that misrepresents the service they actually provide. They will also be free

to again start "throttling", "blocking" and otherwise harming class member Internet connections on November 1, 2010.

The settling parties have failed to carry their burden to show that the proposed settlement is fair. While there are mentions of depositions, discovery and independent network monitoring, no document accessible to class members demonstrates anything other than that the settling parties have reached a mutually agreeable position. Their factual claims are unsupported by evidence and they offer only self-serving opinions about the satisfactory nature of their agreements with the endorsement of the sole class member who will receive meaningful compensation in this matter.

While it may be reasonable for this Court to approve a settlement that has the unanimous support of all active parties in the proceeding, a contested settlement should not be entitled to any greater weight or deference merely by virtue of its label as a settlement; it is merely a joint position of its proponents. The reasonableness of the settlement for all parties should be thoroughly demonstrated by the record. The parties have failed at this task.

### B. SYNOPSIS OF THE PROPOSED SETTLEMENT TERMS.

The PSA impacts "all persons … who, between August 19, 2003 and [July 31, 2009], subscribed for [sic] RCN's broadband Internet service." (Doc. No. 31-2 § 2.8.) It does not address the class of individuals who subscribed on or after July 31, 2009 yet will be subjected to the "throttling" or "blocking" provided in § 3.4. It does nothing to address RCN's actions on or after November 1, 2010, even though RCN

continues to advertise their Internet services in a manner similar to that at issue in this matter[3].

PSA § 3.2 indicates that prior to May 1, 2009, RCN was engaging in P2P Network Management Practices. RCN agrees not to engage in P2P Network Management Practices until November 1, 2010, just 4 months and 28 days after the scheduled fairness hearing.

PSA § 3.2 further indicates that prior to April 1, 2008, RCN was engaging in Non-P2P Network Management Practices. RCN agrees not to engage in Non-P2P Network Management Practices until July 31, 2009. This period expired 308 days before the scheduled fairness hearing.

PSA § 3.3 indicates that until November 1, 2010, RCN will engage an outside expert to monitor and test its network to ensure it is not engaging in P2P Network Management Practices. This provision does not require the outside expert to disclose his methodology or results to class members. To date, no reports or information, except for an Agreement and Order Governing the Treatment of Confidential Information (Doc. No. 33.) resulting from this independent testing has been filed with the Court or provided to class members. The parameters of the outside expert testing are carefully limited, and do not extend to testing of other parameters relevant to class claims being released (those which could have, but

---

[3] See Exhibit A, attached hereto, containing a copy of Defendant's current website promoting "Internet so fast you have time to slow down" that is "Perfect for: ... Downloading music, files, and videos in seconds; Telecommuting, serious gaming, and downloading multiple files concurrently". http://www.rcn.com/new-york/high-speed-internet/services-and-pricing (Last accessed May 2, 2010).

were not, alleged in the complaint). If the outside expert detects noncompliance, RCN Corporation is not subject to any penalty.

PSA § 3.4 permits all future Network Management Practices after November 1, 2010. Implementation of Non-P2P Network Management Practices is permitted under specific conditions during the 4 months and 28 days after the scheduled fairness hearing.

PSA § 3.5 requires that if RCN Corporation chooses to implement Non-P2P Network Management Practices during the 4 months and 28 days after the scheduled fairness hearing, they will provide 60 day notice to customers and Class Counsel, and give customers an opportunity to cancel Internet service without penalty. This provision does not allow customers to cancel other RCN services, and does not apply after November 1, 2010. RCN is not required to prominently post notice of its Network Management Practices either on their home page or on the pages used to market and sell Internet service. Instead, they are permitted to bury such information on an obscure policy page[4].

PSA § 3.6 allows RCN to implement P2P and Non-P2P Network Management Practices immediately, if RCN Corporation determines doing so will "protect its network from … harm". They may either seek advance permission from the Plaintiff and the Court, or seek that permission within 48 hours of implementation. This provision, like the remainder of the PSA, expires on November 1, 2010.

---

[4] Exhibit "B", attached, shows an example of Defendant's current policy and home page. The policy page lists numerous legal documents applying to various services provided by RCN. There is no consolidated document containing all terms applicable to Internet service. http://www.rcn.com/new-york/policies-and-disclaimers (Last accessed May 2, 2010.) Nothing on the home page highlights this litigation, settlement or RCN's policies and practices.

PSA § 5.1 requires that, in exchange for RCN's self-imposed "time-out" from P2P and Non-P2P Network Management Practices until November 1, 2010, each class member grant an overly-broad general release of "all claims arising from their subscription to or use of RCN broadband Internet service and/or the advertising and marketing of that service as it relates to P2P and/or Non-P2P Network Management Practices that are, or could have been, asserted in the Litigation…"

PSA § 5.2 expands the definition of the settlement class to include individuals who likely have absolutely no notice of these proceedings. This section further releases any known or unknown claims of any type against the Defendant and a laundry list of parties tangentially related to the Defendant (including their "partners" and "accountants") for "acts, omissions or other conduct that is or could have been alleged in the Litigation".

PSA § 5.3 indicates that the facts upon which the Settlement Agreement was executed may actually be entirely different than what is believed by Plaintiff and Class Counsel. Class members have had no opportunity to examine these facts, nor have they been placed on the record. Nevertheless, Plaintiff agrees that the Settlement Agreement is fair and should remain in force even if these facts should later be proven inaccurate.

PSA § 7.1 indicates that RCN Corporation will not object to an application by Class Counsel for an award of $540,000 in fees and expenses. No support is provided for this figure.

PSA § 7.2 indicates that, if the Settlement Agreement is approved by the Court, Defendant is willing to make a $3,000 incentive payment to Plaintiff for her services as class representative.

PSA § 7.3 and 7.4 provide for escrow of the amounts listed in 7.1 and 7.2 in the event of an appeal, or if the agreement is reversed or modified. This section provides a powerful incentive to Plaintiff and Class Counsel to seek approval of this settlement without modification of its terms.

## C. THE SETTLEMENT AGREEMENT IS NOT FAIR, REASONABLE OR ADEQUATE AND SHOULD BE REJECTED BY THE COURT.

Contrary to claims in Plaintiff's Memo, Rule 23(e) of the Federal Rules of Civil Procedure do not require approval of "any" class action settlement. Indeed, "the Court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate". Fed. R. Civ. P. 23(e)(2).

The Second Circuit, in *Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), provided a non-exhaustive list of factors to guide courts in reviewing a settlement proposal. These factors clearly indicate that the Proposed Settlement Agreement is not fair, reasonable or adequate.

### i. Complexity, Expense and Likely Duration of the Litigation

Plaintiff correctly indicates that if the PSA is not approved, actual litigation or even appeal would be necessary. Further litigation is not necessary, they claim, because the maximum recovery that would be obtained in further litigation has already been achieved by the PSA.

While Plaintiff's "chief aim" may have been to obtain an injunction that prohibits Defendant from "engaging in network management practices that adversely affect class members" (Plaintiff's Memo), the proposed settlement agreement does not achieve this objective. Defendant voluntarily ceased P2P and Non-P2P blocking or limiting months before the settlement agreement was signed. Instead of making open access to the Internet a permanent state of affairs for class members, the proposed settlement agreement legitimizes the resumption of P2P and Non-P2P blocking or limiting on November 1, 2010.

The injunctive relief that would be provided to the class if the proposed settlement agreement were approved is negligible at best. While some form of injunctive relief may at a later point be determined an adequate remedy for the class, such an injunction should not be of such a short duration that it serves no practical purpose. By their own admission, Defendant has been able to operate their network without difficulty since ceasing P2P blocking or limiting on May 1, 2009 and Non-P2P blocking or limiting since April 1, 2008. If anything, this has demonstrated that significantly extending or making permanent an injunction against P2P and Non-P2P blocking or limiting would be a reasonable benefit to class members that would not harm Defendant.

ii.    <u>Reaction of the Class to the Settlement</u>

Plaintiff's Memo indicates that reaction to the settlement cannot be discussed because, at the time that document was filed, such discussion was premature. The lack of public outrage over the proposed settlement agreement is due in large part

to Class Counsel's failure to properly educate class members about this very litigation and is further compounded by the failure of Class Counsel to ensure the Notice of Pendency of Class Action (Doc. No. 31-3.) clearly alerted class members that the relief granted would permit resumption of P2P and Non-P2P blocking and limiting on November 1, 2010.

The current situation for class members is quite unique. It is entirely possible that class members subscribed to Defendant's Internet services after RCN Corporation ceased the activities at issue in the Complaint. Those class members who did experience blocking or limiting would rightly assume that RCN is no longer engaging in such activities. Busy class members who fail to carefully examine the notice and related documents would not necessarily be aware that they are giving up their rights only to allow Defendant to resume P2P and Non-P2P blocking and limiting in a few short months. They rightly assume that, in exchange for the fees they are awarded, Class Counsel has a duty to represent their interests and protect them from future harm.

Further, opting out of this class action settlement is of little practical use to the average consumer. The costs and efforts involved in proceeding as an individual in this matter, without the benefit of class certification and lack of access to discovery conducted in the name of class members, would make same economically impossible. The limited financial damage caused to each individual requires a class solution.

Even objecting to the proposed settlement agreement requires significant investment of time and energy which not every class member is willing or able to make. A low number of objections or opt-outs should not be interpreted to clearly indicate that class members accept the settlement, same simply indicates that the class members are busy people who trust that the Court, Plaintiff and Class Counsel will ensure any settlement is fair, reasonable and adequate.

Additionally, while Defendant has certainly endeavored to distribute notice of the upcoming Fairness Hearing to class members through email and first class mail, they have buried notice of this action on a large policy page. Nothing on Defendant's home page at http://www.rcn.com would alert current or potential customers to this pending case.

iii.    Stage of the Proceedings and the Amount of Discovery Completed

Plaintiff reminds the Court that "the parties' knowledge of the strengths and weaknesses of the various claims … consequentially affects the determination of the settlement's fairness." *In re Painewebber Ltd. Pshps. Litig.,* 171 F.R.D. 104, 126 (S.D.N.Y. 1997). Plaintiff then explains that various discovery devices have been employed, that an expert has been secured and that the parties have worked closely with each other to develop the litigation. Unfortunately, Plaintiff has not developed a record of objective evidence that would indicate to the Court or to the class that the proposed settlement agreement is fair, reasonable or adequate.

Instead, Plaintiff has explicitly agreed, in PSA § 5.3, that the facts Plaintiff and Class Counsel currently believe may, in fact, be completely false and without

merit. Permitting a settlement agreement upon facts which may later prove to be based entirely in fiction serves only to quickly resolve the matter and allow Class Counsel to move onto the next, pocketing their fees without regard to the future impact on class members.

Objector does not urge a trial on the merits, but does urge the Court to examine whether Plaintiff has adequate information upon which to base their claims that the proposed settlement is fair, reasonable and adequate in light of Proposed Settlement Agreement § 5.3.

iv.    Risks of Establishing Liability

Every Plaintiff must eventually establish liability to prevail at trial. Plaintiff, however, appears unwilling to take on this task. While noting that similar actions have been dismissed before trial, Plaintiff fails to point out that similar actions have also experienced successful outcomes. *See In Re: Comcast Corporation Peer-to-Peer (P2P) Transmission Contract Litigation*, 2:08-MD-1992-LDD (E.D.P.A. December 13, 2009) (Pending settlement agreement which awards class members up to $16,000,000 for similar actions by Comcast, another cable-based Internet access provider). A copy of the Settlement Agreement in the Comcast litigation is attached hereto as Exhibit "C". Further, Defendant's own admissions as to a cessation date for P2P and Non-P2P blocking and limiting help to demonstrate Defendant's past actions and bolster Plaintiff's claims.

Plaintiff has done nothing to establish that their risks in establishing liability are in any way unusual or greater than that experienced by an average Plaintiff.

- 14 -

They certainly have not identified any issues as devastating to their case that to merit compromise of class claims with inadequate compensation.

v.    Risks of Establishing Damages

Similar to the risks of establishing liability, Plaintiff has not established that the risks of establishing damages in this matter are greater than in other matters. Here, other similar actions, such as *In Re: Comcast* may prove helpful in showing relief granted to class members in similar matters.

Plaintiff's Memo indicates that the injunctive relief granted in the proposed settlement agreement "guarantee[s] that consumers received uncapped ability to use the Internet" and precludes the need to for this Court to examine the potential for demonstrable damages. While the PSA will cement past actions, it does nothing to guarantee that consumers will continue to receive the "uncapped ability to use the Internet". In fact, the proposed settlement agreement does nothing to prevent the recurring harm of future P2P and Non-P2P blocking or limiting.

vi.    Risks of Maintaining the Class Action Through the Trial

The parties stipulated to the class certification only for the purposes of settlement. There is nothing in the record to indicate that the class could not be certified at trial. The Defendant would certainly oppose such an action, as would be their right, but this honorable Court is more than adequately equipped to undertake any necessary analysis of any legal or factual issues Defendant might raise during that process. Here, again, the risks in this matter are no greater than

those in similar actions, and this type of action is one ripe for class relief under the Rules.

    vii.    <u>Ability of the Defendant to Withstand a Greater Judgment</u>

Plaintiff urges the Court to consider this factor in only one direction. While determining that a Defendant has no further resources from which to make a larger settlement is an important consideration to be made in other class actions, same is not the instant concern. This settlement is unreasonable and inadequate precisely because the Defendant has demonstrated the feasibility of an effective long-term solution to their past P2P and Non-P2P blocking or limiting.

RCN Corporation ceased blocking or limiting P2P services on May 1, 2009. They ceased similar actions against Non-P2P services on April 1, 2008. Since that time, RCN's network has allegedly been monitored by an independent monitor. Additionally, during that time, Defendant had the ability to resume blocking at any time. Nothing on the record indicates that either RCN's internal network staff or the independent monitor noted problems caused by the lack of blocking or limiting. There are no customer complaints on the record demanding that their neighbors have their traffic blocked or limited. If anything, RCN Corporation has demonstrated that their robust network would permit them to continue delivering the very services they advertise and sell without blocking or limiting.

Extending or making permanent the injunction against P2P and Non-P2P blocking or limiting is the only way to truly "enjoin Defendant from engaging in practices that adversely affect RCN subscribers' ability to use the Internet." (Doc.

No. 30.) As the PSA currently stands, the class would receive nearly equal benefit if the settlement were rejected completely and the case dismissed. Any additional relief granted in the event the matter moved to trial would be an improvement over the Parties' current agreement.

The ability of the Defendant to withstand a greater judgment is one of the core issues that should be considered when evaluating the proposed settlement agreement. Inadequate relief should only be permitted in cases where granting further relief would be devastating to the Defendant. Here, the value of the releases given by class members far outweighs any economic benefit the class will derive from the proposed settlement agreement. This is fundamentally unfair and serves only to insulate the Defendant from liability and to enrich Plaintiff and Class Counsel at the expense of those who were harmed.

    viii.    Range of Reasonableness of the Settlement In Light of the Best Possible <u>Recovery and In Light of All the Attendant Risks of Litigation</u>

Plaintiff urges this Court to consider only one portion of the range of reasonableness, focusing on the fear and uncertainty of litigation. When viewed in that light, the proposed settlement rates slightly above immediate loss in summary judgment. In that situation, the benefit conferred to class members would be roughly the same, and class members would not be bound by the expansive releases granted in the PSA. The proposed settlement agreement preserves the lack of P2P blocking and limiting (but does not prohibit Non-P2P blocking and limiting) for only

a few short months. The PSA, however, does ensures that Plaintiff and Class Counsel secure for themselves significant financial benefit.

Objector urges the Court to consider the reasonableness of the proposed settlement agreement in light of the best possible recovery. As seen in Exhibit "C", settlement for such claims can be far greater than that proposed by the parties. An entire range of settlement options would provide not only appropriate recovery for class members but would ensure future RCN customers receive the services they purchase at little or no actual expense to Defendant. Such recovery could include:

1. Long-term or permanent injunctive relief preventing RCN from blocking or limiting P2P and Non-P2P traffic on their network, except to prevent demonstrable harm to their network or the quality of services. Such an injunction should be monitored by an independent third party who would provide testing, public reports and receive quality-of-service complaints from customers, and should include penalties for violations;

2. Compensation to customers who subscribed before Defendant ceased P2P and Non-P2P blocking or limiting. This compensation could come either as a cash incentive or, preferably, as increased service for a number of months equal to the period of time where customers were subject to P2P and Non-P2P blocking or limiting[5]; and

---

[5] RCN Corporation offers Internet services in various "Tiers", providing additional speed at each level. Providing the additional speed can be accomplished remotely without needing to replace customer equipment. Customers currently subscribing to the highest Tier could simply have a billing credit applied to their account for the difference between the highest tier and the next lowest option.

3. Establishment of a fund to support development and improvement of residential Internet service monitoring tools and services, helping class members and future customers understand the services they are receiving, compare providers and easily report trouble or difficulty.

A long-term solution is preferable to short-term relief because in many instances, class members and future customers of RCN have little or no significant option in selecting high speed Internet services. DSL services, provided through a phone line, do not typically offer the same or similar speeds as can be obtained through cable service and many municipalities artificially limit the number of cable providers. Wireless or satellite providers do not provide comparable Internet services, and commercial-class leased connections are far too expensive for the typical residential customer.

Additionally, many customers receive far more than Internet services through RCN. They also purchase television and, in some cases, Voice Over IP (VOIP) Telephone services. The provisions of the PSA that allow aggrieved class members to cancel their services in the event RCN reinstitutes blocking or limiting prior to November 1, 2010 do not explicitly allow cancellation of other services without penalty, significantly diminishing the utility of allowing customers to cancel RCN services. This "vendor lock in", however, may prove beneficial to RCN if an improved settlement is offered. Assuming class members receive fair compensation and can trust that in the future their Internet access will not be blocked or limited, they may choose to further expand the services they receive from RCN. Customers

who receive increased Internet speed might choose to continue that tier of service, leading to increased revenue for RCN. Defendant would also be well positioned to market itself as providing the "uncapped ability to use the Internet".

ix.    Arm's-Length Negotiation

The Complaint (Doc. No. 1) in this matter was filed on August 19, 2008. Settlement negotiations started as early as September 3, 2008. (Doc. No. 12.) Objector does not allege that the parties have colluded or otherwise acted unethically, but does note that the parties have reached a proposed settlement agreement that meets their needs – Defendant limits their liability and Plaintiff and Class counsel receive significant financial incentives – at the expense of class members, who receive only token forbearance of P2P and Non-P2P blocking and limiting.

While class action litigation is a necessary and effective method for resolving claims similar to those experienced by the RCN customers in this matter, such litigation is only of value when Plaintiff and Class Counsel are diligently serving the needs of the entire class. It is appropriate for the Court to carefully examine Class Counsel's motivations in pushing for settlement at this time and upon these terms, and to require that the proponents of the PSA provide objective facts on the record indicating that it is fair, reasonable and adequate.

2.   **CLASS COUNSEL HAVE SIGNALED THEIR INTENTION TO POCKET GROSSLY EXCESSIVE FEES FOR THEIR SECRET WORK PROCURING A SETTLEMENT DESIGNED PRIMARILY TO ABSOLVE DEFENDANT OF FUTURE LIABILITY FOR RESUMING THE EXACT BEHAVIORS COMPLAINED ABOUT BY THE PLAINTIFF AS EARLY AS NOVEMBER 1, 2010.**

A prevailing party is entitled to costs. Fed. R. Civ. Proc. 54(d)(1). It is within a court's discretion to deny costs to a prevailing party when that party's success is but a small fraction of the relief they originally sought and litigated. *Farrar v. Hobby*, 506 U.S. 103 (1992). Under the terms of the proposed settlement agreement, Class Counsel obtained $0 in economic benefit for the class they purport to represent; they originally claimed that their damages were in excess of five million dollars plus statutory and punitive damages. They "asked for a bundle and got a pittance." *Id.* at 120 (O'Connor, J., concurring). This is the sort of *de minimis* nuisance settlement that should be awarded no more than nominal costs or fees. *Id.* at 121-22.

Class Counsel have signaled their intention to apply for up to $540,000 in attorney's fees and expenses. The parties have further agreed to make an incentive payment to Plaintiff in the amount of $3,000. Both of these awards are excessive when judged against the actual value obtained for the class; these large sums provide the only incentive for Plaintiff and Class Counsel to recommend settlement upon the terms proposed.

Class Counsel specializes in consumer class action litigation. Since filing this matter, they have employed five attorneys to work on thirty to forty other class action cases. Three of those other cases are similar to the instant matter. (Footnote

3, Doc. No. 38.) While contingency cases such as the instant matter are not billed by the hour, considering the number of hours worked on the case is an effective metric for determining the reasonableness of a fee application. Assuming all five attorneys actively work on pending cases at least 2,500 hours per year (just over eight hours per day, six days per week, for fifty-two weeks per year), Class Counsel's firm has an available pool of 12,500 attorney hours for work on their cases. With five busy attorneys and thirty pending cases, the firm can reasonably devote 417 hours to each case per year.

On June 4, 2010, the date of the fairness hearing, this matter will have been pending for 1 year, 9 months and 17 days. Granting that some hours attributable to the three other similar actions pending within the firm could be charged to this matter, Objector submits that some 850 hours could have been devoted to this case at that point. Dividing the proposed $520,000 attorney fee award by these hours indicates an incredibly healthy billing rate of <u>$611.76 per hour</u>. The actual amount realized by Class Counsel per hour, based on the number of cases handled and hours actually worked by their attorneys could be far greater than this figure. Objector can find no basis in the record for such an excessive fee award.

Likewise, the parties have agreed to award Plaintiff an incentive award of $3,000. While Plaintiff has no doubt invested time and energy into this case, there is little on the record to provide a basis for such a significant incentive.

The Comcast Settlement Agreement (Exhibit "C") provides insight into fee awards and incentive payments in a similar case. In that matter, Class Counsel

obtained significant and permanent change of Comcast's business practices, including (1) revising and enhancing Comcast's disclosures regarding network management practices; (2) changing Comcast's network management practices to a protocol agnostic approach; (3) increasing Comcast's network capacity and bandwidth; and (4) establishing a fund of up to Sixteen Million Dollars ($16,000,000) to pay claims by class members. Class members are entitled to receive up to $16 as a part of the settlement. For their work, Class Counsel in the *Comcast* matter are entitled to an award of fees and costs of up to Three Million Dollars ($3,000,000). The *Comcast* Plaintiff is awarded an incentive payment of $2,500.

*Comcast* Class Counsel secured lasting and permanent change to Comcast's behavior and cash compensation to class members. Their fee of 18.75% appears reasonable in light of the significant value they provided to class members. In the instant matter, no percentage calculation is possible, as Class Counsel have obtained relief with no economic value to the class. Their fee award is pure lagniappe.

Plaintiff and Class Counsel have certainly expended time and effort on this matter. In the event of a recovery for the class, they certainly deserve compensation for that time and effort. The proposed fee and incentive awards included in the settlement agreement do not, however, reflect either the effort expended on behalf of or the compensation obtained by class members. The Court should limit fee and incentive awards to reasonable amounts reflecting the benefit achieved through this litigation.

3.   **RENEGOTIATION OF THE SETTLEMENT IS NECESSARY TO PROVIDE CLASS MEMBERS WITH ADEQUATE COMPENSATION.**

Objector recognizes that that this Court is not empowered to remake the parties' agreement. *Levenson v. American Laser Corp.*, 438 So.2d 179, 183 (Fla. App. 2d Dist. 1983); *Evans v. Jeff D.,* 475 U.S. 717, 726-27 (1986). The Court can, however, reject the current agreement and suggest what changes would be necessary for approval. *See id.* at 726; *Bowling v. Pfizer,* 143 F.R.D. 138 (S.D. Ohio 1992) (court suggested changes later incorporated in *Bowling v. Pfizer*, 143 F.R.D. 141 (S.D. Ohio 1992)). Mr. Lyon urges the Court to take that approach here.

In its current incarnation, the proposed settlement agreement is not fair, reasonable or adequate. The injunctive relief granted to class members is illusory. It confers no significant benefit to the class and does nothing to ensure class members and other RCN Internet customers receive the uncapped and high-speed Internet service promised by RCN.

<u>CONCLUSION</u>

Plaintiff and Class Counsel have brought either (1) a meritorious case that is being settled for an infinitesimal fraction of the case's real value in a "sellout" of the attorneys' and class representatives' fiduciary duties to the class, or (2) a meritless lawsuit where the "class device had been used to obtain leverage for one person's benefit." *Murray v. GMAC Mortgage Corp.,* 434 F.3d 948 at 952 (7th Cir. 2006). In either instance, the Plaintiff and Class Attorneys' actions should be deterred, rather than rewarded.

For this and the other reasons stated herein, Mark Lyon respectfully requests that the Court reject the proposed settlement agreement as failing to comply with the requirements of Rule 23(a)(4) and Rule 23(e).


Dated:        New York, New York
              May 3, 2010

                                    By: _____
                                        Mark Henry Lyon
                                        511 Avenue of the Americas
                                        Suite 309
                                        New York, New York 10011
                                        Telephone: (212) 202-0343
                                        mark@marklyon.org

                                        *Pro-Se Objector*

## CERTIFICATE OF SERVICE

I, Mark Lyon, hereby certify that on the 3rd day of May, 2010, a true and correct copy of the foregoing OBJECTION TO CLASS ACTION SETTLEMENT AGREEMENT was forwarded via U.S. Mail, first class postage prepaid, to the following at the addresses shown below:

Kim Eleazer Richman, Esq.
230 Park Avenue, Suite 963
New York, NY 10169

Michael Robert Reese
Reese Richman, LLP
875 Avenue of the Americas
18th Floor
New York, NY 10001

Peter Curtis Neger
Bingham McCutchen LLP (NYC)
399 Park Avenue
New York, NY 10022

Matthew Derek Care
Bingham McCutchen LLP (NYC)
399 Park Avenue
New York, NY 10022

Maria M. Patterson
Diamond McCarthy LLC (NY)
620 Eighth Avenue, 39th Floor
New York, NY 10018

Dated:     New York, New York
           May 3, 2010

By: _____
    Mark Henry Lyon
    511 Avenue of the Americas
    Suite 309
    New York, New York 10011
    Telephone: (212) 202-0343
    mark@marklyon.org

    *Pro-Se Objector*

Change Your Location: Select ▾

**RCN★**
New York City

About RCN   Webmail   Customer Center   Help   Contact Us   800.RING.RCN

Special Offers | Shop Online

FOR HOME   |   FOR BUSINESS

High-Speed Internet   Digital Cable TV   Phone   Bundles

NEW YORK CITY

# High Speed Internet

Plans & Pricing

What You Need

Home Networking

Internet Security

Compare Cable vs. DSL



❓ Can I get service at my home?
Check to see if RCN is available to you.

## Prepare for take-off

- Download music and movies quickly
- Includes email accounts & video mail
- Access exclusive online entertainment
- Get free 24/7 technical support

If you're looking for high-speed Internet in New York City, you're in luck. Our advanced fiber-optic network delivers a powerful and secure Internet connection to homes in Manhattan, Queens, Brooklyn and the Bronx. It's high-tech, high-speed and low-cost.

**Fiber-Optic Internet Speeds**
Vroom, Vroom — Speeds Up To 20 Mbps
Choose from four fantastic fiber-optic Internet speeds and get the right connection for you. Whether you're downloading movies and music or simply checking your email, our advanced fiber-optic network is always reliable and lightning-fast.

**Learn more about our fiber-optic Internet speeds** »

**Webmail**
Super-Powered Email
With webmail service included, you'll get up to four email accounts and a total of 2GB of storage. Best of all, webmail is displayed without annoying



## How Fast is Fast Enough?

It really depends on what you need to do. With our advanced fiber-optic network, we have reliable speeds for every need.

**Browse With Ease**
3 Mbps download/384Kbps upload



**Watch High-Quality Video**
10 Mbps download/800 Kbps upload

**Play Online Games**
20 Mbps download/2 Mbps upload

Pick your speed ○

adsl

Learn more about webmail ⊕



## Exclusive Online Entertainment
**We Call It 'Internet-ainment'**

Get special access to a new dimension of online entertainment – included with your high-speed Internet service. Watch 24/7 live sports coverage with ESPN360.com and up-to-the-minute news with ABC News Now. There's also interactive fun for the whole family with Disney Connection.

Learn more about exclusive online entertainment ⊕

## Home Networking
**Wireless Internet Is A Breeze**

Going wireless is easy with our home networking service. Equip your home with a modem/router that beams wireless Internet access to personal computers, gaming consoles and more. Installation includes configuration of four devices and you get free 24/7 technical support.

Learn more about wireless home networking ⊕

Service offerings are contingent upon RCN verification that the specific address covered by the service request is an RCN serviceable location. Prices do not include taxes, franchise fees or other surcharges. Services and pricing are subject to change. All photos used within rcn.com are intellectual properties of their respective owners. Services are subject to terms and conditions of RCN's subscriber agreements; on-line policies, and other applicable terms and conditions. Other restrictions may apply.

High-speed modem required for RCN High-Speed Internet service. If a data outlet is needed, an additional outlet fee may apply in addition to applicable installation fees. A fully configured 10 Base-T Ethernet card must be installed in subscriber's computer prior to the installation of the cable modem. Actual speeds may vary and are not guaranteed. Customers who opt out of services may be subject to a non-refundable $5.00 service downgrade processing fee.

**High-Speed Internet**
Services & Pricing
Bundles
Cable vs. DSL
Home Networking

**Digital Cable TV**
Services & Pricing
Bundles
Channel Lineups
ON DEMAND Movies

**Phone**
Services & Pricing
Bundles
Phone Extras
International Calling

**Come Home to RCN!**

When you come home to RCN, you're connecting to a competitive digital entertainment provider that is committed to bringing customers the best digital cable TV, high-speed Internet and phone bundles to homes in and around Boston, Chicago, New York City, the Lehigh Valley, Philadelphia and Washington, D.C., over a reliable

network of fiber-optic cables.

In New York City, we provide service to Queens, Brooklyn and Manhattan. Read more

About RCN | News | Investor Relations | Careers | Contact Us

Sitemap | Policies & Disclaimers | Privacy Policy | Become A Fan | Follow Us | Mobile Alerts

© 2010 RCN Corporation. All Rights Reserved.

EXHIBIT "A"                                3







**Watch High-Quality Video**
10mbps download/800Kbps upload

**Play Online Games**
20mbps download/2mbps upload

**Bundle & Save**
Cable, Internet & Phone

as low as **$74.99**/mo.

Learn More

| Great Add-Ons | What You Need | Included Features | Cable vs. DSL |

**Limited-time Offer!**

**10 Mbps Internet**

**$26.99/mo**
+ modem = $30.99
12-month contract

Order Online Now

**Perfect for:**
- Individuals, families, and home offices
- Downloading music, files, and videos in seconds
- Telecommuting, serious gaming, and downloading multiple files concurrently

**You get:**
- Upload speeds up to 800Kbps / downloads up to 10Mbps

| Great Add-Ons | What You Need | Included Features | Cable vs. DSL |

**20 Mbps Internet**

**$51.99/mo**
+ modem = $55.99
12-month contract

Order Online Now

**Perfect for:**
- Individuals, families, and home offices
- Downloading music, files, and videos in seconds
- Telecommuting, serious gaming, and downloading multiple files concurrently

**You get:**
- Upload speeds up to 2Mbps / downloads up to 20Mbps

Service offerings are contingent upon RCN verification that the specific address covered by the service request is an RCN serviceable location. Prices do not include taxes, franchise fees or other surcharges. Services and pricing are subject to change. All photos used within rcn.com are intellectual properties of their respective owners. Services are subject to terms and conditions of RCN's subscriber agreements, on-line policies, and other applicable terms and conditions. Other restrictions may apply.

High-speed modem required for RCN High-Speed Internet service. If a data outlet is needed, an additional outlet fee may apply in addition to applicable

installation fees. A fully configured 10 Base-T Ethernet card must be installed in subscriber's computer prior to the installation of the cable modem. Actual speeds may vary and are not guaranteed. Customers who opt out of services may be subject to a non-refundable $5.00 service downgrade processing fee.

RCN's current monthly service charge ranges from $65 to $78, depending on area and services elected. Customer has no obligation to opt into contract price, but in that event, customer agrees to be bound by the terms and conditions of the contract, including, without limitation, the obligation to pay an early termination fee if services are cancelled prior to the expiration of the contract term. Installation fees may apply.

Downstream data speed may be affected by whether the data accessed is cached or non-cached; Internet-related factors, such as the location and configuration of each accessed server, internal network factors, including customer compliance with RCN usage policies set forth in the subscriber agreement and acceptable usage policy; the level of overall traffic; and the customer's computer configuration.

The availability of services, pricing and offerings displayed on this site are for residential new RCN customers only. Commercial and business pricing and service offerings differ.

## Come Home to RCN!

When you come home to RCN, you're connecting to a competitive digital entertainment provider that is committed to bringing customers the best digital cable TV, high-speed Internet and phone bundles to homes in and around Boston, Chicago, New York City, the Lehigh Valley, Philadelphia and Washington, D.C. over a reliable network of fiber-optic cables.

In New York City, we provide service to Queens, Brooklyn and Manhattan. Read more

**High-Speed Internet**
Services & Pricing
Bundles
Cable vs. DSL
Home Networking

**Digital Cable TV**
Services & Pricing
Bundles
Channel Lineups
ON DEMAND Movies

**Phone**
Services & Pricing
Bundles
Phone Extras
International Calling

About RCN | News | Investor Relations | Careers | Contact Us

Sitemap | Policies & Disclaimers | Privacy Policy | Become A Fan | Follow Us | Mobile Alerts

© 2010 RCN Corporation. All Rights Reserved.

**RCN**
New York City

Change Your Location: Select ▾

About RCN   Webmail   Customer Center   Help   Contact Us   800.RING.RCN

FOR HOME    FOR BUSINESS

**High-Speed Internet**   Digital Cable TV   Phone   Bundles

Special Offers   Shop Online

HIGH SPEED INTERNET IN NEW YORK CITY

# What You Need

Plans & Pricing

**What You Need**

Home Networking

Internet Security

Compare Cable vs. DSL

We'll install your network connection with the cable modem of your choosing. Professional technicians will install your service and you'll also get free 24/7 technical help. You'll need to make sure your computer meets our recommended system requirements and decide if you want wireless Internet in your home.



## Cable Modem Service

We use fiber-optic cables to provide Internet access, with greater bandwidth than DSL, resulting in a faster online experience. We provide and install a high-quality cable modem, proven to deliver a fast connection.

If at anytime you decide to use your own cable modem, you must return the one we installed in your home to one of our payment centers.

## Bring Your Own Cable Modem

If you want to use your own cable modem, you can choose to install it yourself or have one of our professional technicians install it at the time of your high-speed Internet installation. While many models will work on our network, some will simply work better. To achieve optimal performance, we recommend you purchase one of our preferred cable modems.

⊕ What kind of cable modem should I purchase?

## Computer Requirements

Our advanced fiber-optic network and the cable modem installed in your home deliver a fast Internet connection, but your computer plays an important part. To ensure functional and optimal performance, check to see if your computer meets our recommended system requirements.

❓ **Can I get service at my home?**
Check to see if RCN is available to you.



### Tips For Getting a Faster Internet Connection

➤ Connecting your cable modem to your computer via a USB cable may slow you down.

➤ If you're using a PC, download all available Microsoft operating system patches. Downloading these patches is critical to the performance of your PC.

➤ Programs that run in the background such as instant messaging software, email clients like Outlook Express, or any other program that is connected to the Internet, communicate over the same cable modem so closing them will free up

» Does my computer meet the minimum requirements?

**Going Wireless**



Getting a wireless Internet connection is easy. A single integrated gateway (a cable modem with a built-in wireless router) is installed in your home with Internet access for up to four devices including personal computers and game consoles. Installation includes device configuration. And for telecommuters and serious online gamers, we also offer static IP service.

**Learn more about our home networking service** »

- If you are using a wireless Internet connection, your speed may be slower than your actual cable modem speed. Connecting directly to the Internet when downloading large files will reduce download times.

Services/offerings are contingent upon RCN verification that the specific address covered by the service request is an RCN serviceable location. Prices do not include taxes, franchise fees or other surcharges. Services and pricing are subject to change. All photos used within rcn.com are intellectual properties of their respective owners. Services are subject to terms and conditions of RCN's subscriber agreements, on-line policies, and other applicable terms and conditions. Other restrictions may apply.

High-speed modem required for RCN High-Speed Internet service. If a data outlet is needed, an additional outlet fee may apply in addition to applicable installation fees. A fully configured 10 Base-T Ethernet card must be installed in subscriber's computer prior to the installation of the cable modem. Actual speeds may vary and are not guaranteed. Customers who opt out of service may be subject to a non-refundable $5.00 service downgrade processing fee.

**Come Home to RCN!**

When you come home to RCN, you're connecting to a competitive digital entertainment provider that is committed to bringing customers the best digital cable TV, high-speed Internet and phone bundles to homes in and around Boston, Chicago, New York City, the Lehigh Valley, Philadelphia and Washington, D.C. over a reliable network of fiber-optic cables.

In New York City, we provide service to Queens, Brooklyn and Manhattan. Read more

**High-Speed Internet**
Services & Pricing
Bundles
Cable vs. DSL
Home Networking

**Digital Cable TV**
Services & Pricing
Bundles
Channel Lineups
ON DEMAND Movies

**Phone**
Services & Pricing
Bundles
Phone Extras
International Calling

**About RCN** | **News** | **Investor Relations** | **Careers** | **Contact Us**

Sitemap | Policies & Disclaimers | Privacy Policy | Become A Fan | Follow Us | Mobile Alerts

© 2010 RCN Corporation. All Rights Reserved.

Change Your Location: Select ▾

About RCN    Webmail    Customer Center    Help    Contact Us    800.RING.RCN

FOR HOME    FOR BUSINESS

**RCN** ✦
New York City

High-Speed Internet    Digital Cable TV    Phone    Bundles    Special Offers    **Shop Online**

HIGH SPEED INTERNET IN NEW YORK CITY

# Home Networking

Plans & Pricing
What You Need
**Home Networking**
Internet Security
Compare Cable vs. DSL

② Can I get service at my home?
Check to see if RCN is available to you.

From family members vying for time on the computer to the jumble of cords surrounding your desk, a hard-wired Internet connection can create chaos and clutter in your home. Sign up for home networking and set your family (and your computer) free.



### Home Networking
**Unplug And Go Wireless... It's Easier Than You Think**

4.95/mo

Get up to four simultaneous Internet connections for devices like desktop or laptop computers and game stations with network adapters. Your professional installation includes an initial configuration of any four devices and you'll always have access to free 24/7 technical support.

➤ Get a strong Internet signal throughout your home*
➤ Online gaming is a piece of cake with a wireless connection
➤ Keep surfing kids safe with basic parental controls
➤ Home networking is compatible with Macintosh operating systems
➤ Your wireless connection is highly-secure and configurable

You'll also get a Single Integrated Gateway (our fancy way of saying your modem and router are contained in one device), which will be professionally installed in your home.

⊕ How will my home network be installed?
⊕ Does my computer meet the minimum requirements?

### Static IP
**Your Internet Address Isn't Going Anywhere**

19.95/mo

Looking for a more advanced high-speed Internet experience? We've got your solution --a static IP address assigned to your modem. Use it to create a multi-player online gaming environment or to telecommute to work by connecting your home computer to a company network.

The actual range and reliability of a wireless network is effected by a number of factors. Under optimal conditions, the range of RCN's wireless home networking solution is up to 300 feet. Actual performance may vary.

Service offerings are contingent upon RCN verification that the specific address covered by the service request is an RCN serviceable location. Prices do not include taxes, franchise fees or other surcharges. Services and pricing are subject to change. All photos used within rcn.com are intellectual properties of their respective owners. Services are subject to terms and conditions of RCN's subscriber agreements, on-line policies, and other applicable terms and conditions. Other restrictions may apply.

High-speed modem required for RCN High-Speed Internet service. It a data outlet is needed, an additional outlet fee may apply in addition to applicable installation fees. A fully configured 10 Base-T Ethernet card must be installed in subscriber's computer prior to the installation of the cable modem. Actual speeds may vary and are not guaranteed. Customers who opt out or services may be subject to a non-refundable $5.00 service downgrade processing fee.

The actual range and reliability of a wireless network is effected by a number of factors. Under optimal conditions, the range of RCN's wireless home networking solution is up to 300 feet. Actual performance may vary.

The availability of services, pricing and offerings displayed on this site are for residential new RCN customers only. Commercial and business pricing and service offerings differ.

## Come Home to RCN!

When you come home to RCN, you're connecting to a competitive digital entertainment provider that is committed to bringing customers the best digital cable TV, high-speed Internet and phone bundles to homes in and around Boston, Chicago, New York City, the Lehigh Valley, Philadelphia and Washington, D.C. over a reliable network of fiber-optic cables.

In New York City, we provide service to Queens, Brooklyn and Manhattan. Read more

**High-Speed Internet**
Services & Pricing
Bundles
Cable vs. DSL
Home Networking

**Digital Cable TV**
Services & Pricing
Bundles
Channel Lineups
ON DEMAND Movies

**Phone**
Services & Pricing
Bundles
Phone Extras
International Calling

**About RCN | News | Investor Relations | Careers | Contact Us**

Sitemap | Policies & Disclaimers | Privacy Policy | Become A Fan | Follow Us | Mobile Alerts

© 2010 RCN Corporation. All Rights Reserved.







Service offerings are contingent upon RCN verification that the specific address covered by the service request is an RCN serviceable location. Prices do not include taxes, franchise fees or other surcharges. Services and pricing are subject to change. All photos used within rcn.com are intellectual properties of their respective owners. Services are subject to terms and conditions of RCN's subscriber agreements, on-line policies, and other applicable terms and conditions. Other restrictions may apply.

High-speed modem required for RCN High-Speed Internet service. If a data outlet is needed, an additional outlet fee may apply in addition to applicable installation fees. A fully configured 10 Base-T Ethernet card must be installed in subscriber's computer prior to the installation of the cable modem. Actual speeds may vary and are not guaranteed. Customers who opt out of services may be subject to a non-refundable $5.00 service downgrade processing fee.

The availability of services, pricing and offerings displayed on this site are for residential new RCN customers only. Commercial and business pricing and service offerings differ.

**High-Speed Internet**
Services & Pricing
Bundles
Cable vs. DSL
Home Networking

**Digital Cable TV**
Services & Pricing
Bundles
Channel Lineups
ON DEMAND Movies

**Phone**
Services & Pricing
Bundles
Phone Extras
International Calling

**Come Home to RCN!**
When you come home to RCN, you're connecting to a competitive digital entertainment provider that is committed to bringing customers the best digital cable TV, high-speed Internet and phone bundles to homes in and around Boston, Chicago, New York City, the Lehigh Valley, Philadelphia and Washington, D.C. over a reliable

network of fiber-optic cables.

In New York City, we provide service to Queens, Brooklyn and Manhattan. Read more

About RCN | News | Investor Relations | Careers | Contact Us

Sitemap | Policies & Disclaimers | Privacy Policy | Become A Fan | Follow Us | Mobile Alerts

© 2010 RCN Corporation. All Rights Reserved.

EXHIBIT "A"

About RCN   Webmail   Customer Center   Help   Contact Us   800.RING.RCN

**RCN**
New York City

Change Your Location: **Select** ▼

FOR HOME    FOR BUSINESS

**High-Speed Internet**   Digital Cable TV   Phone   **Bundles**

Special Offers   |   Shop Online

HIGH SPEED INTERNET IN NEW YORK CITY

# Compare Cable vs. DSL

Plans & Pricing
What You Need
Home Networking
Internet Security
Compare Cable vs. DSL

? Can I get service at my home?
Check to see if RCN is available to you.

## We're winning the high-speed race

Why choose cable high-speed Internet service over DSL? Three words: fiber-optic technology. As one of the first to use fiber-optic cable, we're able to deliver unsurpassed connection speeds.



### Over 10x Faster Than DSL

With download speeds up to 20 Mbps, cable high-speed Internet offers much faster connections than DSL. And unlike DSL, your Internet speed is not dependent on how far your home is from a central hub. You can download music, upload photos and stream videos quickly and easily.



### Sweet Customer Satisfaction

With cable Internet service, you get added reliability, fewer service disruptions and quicker installation. And with DSL, you might have to "log in" for service. With cable, you're always connected so you never miss an important email or online auction. All that, and free 24/7 technical support.

### The Magic of Fiber

Fiber-optic cable consists of bundles of glass threads that transmit data over light waves.

• Because fiber-optic cables have a greater bandwidth than metal wires, they can carry more data

• Fiber-optic cables are less susceptible than metal wires to interference

• Data can be transmitted over greater distances and with greater reliability than metal wires.

## Fiber-Optics = Savings For You

Fiber-optic cables cost us quite a bit to install because they're so fragile and difficult to splice, but you don't see a penny of that cost. Why? Because we're dedicated to delivering the highest level of service at the lowest price. That, and we just really like fiber-optic cables...



Service offerings are contingent upon RCN verification that the specific address covered by the service request is an RCN serviceable location. Prices do not include taxes, franchise fees or other surcharges. Services and pricing are subject to change. All photos used within rcn.com are intellectual properties of their respective owners. Services are subject to terms and conditions of RCN's subscriber agreements, on-line policies, and other applicable terms and conditions. Other restrictions may apply.

High-speed modem required for RCN High-Speed Internet service. If a data outlet is needed, an additional outlet fee may apply in addition to applicable installation fees. A fully configured 10 Base-T Ethernet card must be installed in subscriber's computer prior to the installation of the cable modem. Actual speeds may vary and are not guaranteed. Customers who opt out of service(s) may be subject to a non-refundable $5.00 service downgrade processing fee.

## Come Home to RCN!

When you come home to RCN, you're connecting to a competitive digital entertainment provider that is committed to bringing customers the best digital cable TV, high-speed Internet and phone bundles to homes in and around Boston, Chicago, New York City, the Lehigh Valley, Philadelphia and Washington, D.C. over a reliable network of fiber-optic cables.

In New York City, we provide service to Queens, Brooklyn and Manhattan. Read more

| High-Speed Internet | Digital Cable TV | Phone |
|---|---|---|
| Services & Pricing | Services & Pricing | Services & Pricing |
| Bundles | Bundles | Bundles |
| Cable vs. DSL | Channel Lineups | Phone Extras |
| Home Networking | ON DEMAND Movies | International Calling |

**About RCN | News | Investor Relations | Careers | Contact Us**

Sitemap   Policies & Disclaimers   Privacy Policy   f Become A Fan   Follow Us   Mobile Alerts

© 2010 RCN Corporation. All Rights Reserved.





# Policies & Disclaimers

NEW YORK CITY

Please be aware of the following RCN Policies & Disclaimers regarding our products, services, & the RCN.com web site.

**Government, Business, and Regulatory**

- Acceptable Use Policy (PDF, 46 KB)
- California Telecommunications Bill of Rights
- Privacy Policy
- Small Business General Terms and Conditions
- RCN Metro Terms and Conditions
- 2008 Equal Employment Opportunity Report (PDF, 68 KB)
- 2008 FCC Employment Reports:
  - Boston, MA (PDF, 1.3 MB)
  - Chicago, IL (PDF, 1.3 MB)
  - Fairfax, VA (PDF, 837 KB)
  - Lanham, MD (PDF, 831 KB)
  - Lehigh Valley, PA (PDF, 1.3 MB)
  - New York, NY (PDF, 338 KB)
  - Philadelphia, PA (PDF, 772 KB)
  - Wilkes-Barre, PA (PDF, 751 KB)
- Tax Definitions:
  - General
  - California
  - Illinois
  - Maryland
  - Massachusetts
  - New York
  - Pennsylvania
  - Virginia
  - Washington, DC
- Tariff Documents:
  - Philadelphia Tariff No. 2
  - Philadelphia Tariff No. 4
  - Pennsylvania Tariff No. 2 (Lehigh Valley area)

**Where We Service**
- Boston
- Chicago
- D.C. Metro Area
- Lehigh Valley
- New York City
- Philadelphia

**Leadership**
- Management
- Board of Directors

**Our History**

**Company Involvement**

**Policies & Disclaimers**

**Investor Relations**
- Stock Information
- Annual Reports
- SEC Filings
- Analyst Coverage
- Non-GAAP Measures
- FAQs
- Financial Contacts
- Events

About RCN | Webmail | Customer Center | Help | Contact Us | 800.RING.RCN

FOR HOME    FOR BUSINESS

High-Speed Internet    Digital Cable TV    Phone    Bundles

Special Offers    Shop Online

Change Your Location: Select ▾

RCN New York City

Can I get service at my home?
Check to see if RCN is available to you.

> Email Alerts

> NEON Archive

**News**

> Media Coverage

> Local Announcements

> News Releases Archive

> NEON Releases

**Careers**

**Contact Us**

○ Pennsylvania Tariff No. 4 (Lehigh Valley area)

**Security**

- Identity Theft Prevention

**Contract Terms**

- Early Termination Fees

**Web**

- Online Shopping Terms and Conditions
- RCN.com Web Site Disclaimer

**Internet**

- Customer Terms and Conditions
- Equipment Return Policy
- Equipment We Support
- High Speed Internet Service Addendum
- High Speed Scope of Support
- Home Networking Addendum
- Home Networking Installation Agreement
- Internet Access Agreement
- RCN BlackBerry End User Agreement
- RCN Journal Agreement
- RCN Music and RCN Games Terms and Conditions
- Security Concerns

**Cable TV**

- Customer Terms and Conditions
- Equipment Return Policy
- Equipment We Support

**Phone**

- Customer Terms and Conditions
- Equipment Return Policy
- Equipment We Support
- Phone Online Service Agreement

**Official Notices**

- Notice of Pendency and Settlement of Class Action: Sabrina Chin v. RCN Corporation, U.S. District Court, S.D.N.Y Civil
  Action No. 08 Civ. 7349 (RJS)
- Class Action Settlement Agreement: Sabrina Chin v. RCN Corporation
- Amendment to Class Action Settlement Agreement: Sabrina Chin v. RCN Corporation
- Order Adopting Report and Recommendation: Sabrina Chin v. RCN Corporation

Service offerings are contingent upon RCN verification that the specific address covered by the service request is an RCN serviceable location. Prices do not

include taxes, franchise fees or other surcharges. Services and pricing are subject to change. All photos used within rcn.com are intellectual properties of their respective owners. Services are subject to terms and conditions of RCN's subscriber agreements, on-line policies, and other applicable terms and conditions. Other restrictions may apply.

**Come Home to RCN!**

When you come home to RCN, you're connecting to a competitive digital entertainment provider that is committed to bringing customers the best digital cable TV, high-speed Internet and phone bundles to homes in and around Boston, Chicago, New York City, the Lehigh Valley, Philadelphia and Washington, D.C. over a reliable network of fiber-optic cables.

In New York City, we provide service to Queens, Brooklyn and Manhattan. Read more

**High-Speed Internet**
Services & Pricing
Bundles
Cable vs. DSL
Home Networking

**Digital Cable TV**
Services & Pricing
Bundles
Channel Lineups
ON DEMAND Movies

**Phone**
Services & Pricing
Bundles
Phone Extras
International Calling

About RCN | News | Investor Relations | Careers | Contact Us

Sitemap | Policies & Disclaimers | Privacy Policy | Become A Fan | Follow Us | Mobile Alerts

© 2010 RCN Corporation. All Rights Reserved.

EXHIBIT "B"

3



EXHIBIT "B"

4



**High-Speed Internet**
Services & Pricing
Bundles
Cable vs. DSL
Home Networking

**Digital Cable TV**
Services & Pricing
Bundles
Channel Lineups
ON DEMAND Movies

**Phone**
Services & Pricing
Bundles
Phone Extras
International Calling

**About RCN** | **News** | **Investor Relations** | **Careers** | **Contact Us**
Sitemap | Policies & Disclaimers | Privacy Policy | Become A Fan | Follow Us | Mobile Alerts

© 2010 RCN Corporation. All Rights Reserved.

**Come Home to RCN!**

When you come home to RCN, you're connecting to a competitive digital entertainment provider that is committed to bringing customers the best digital cable TV, high-speed Internet and phone bundles to homes in and around Boston, Chicago, New York City, the Lehigh Valley, Philadelphia and Washington, D.C. over a reliable network of fiber-optic cables.

In New York City, we provide service to Queens, Brooklyn and Manhattan. Read more

EXHIBIT "B"                                                                 5

IN THE UNITED STATE DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: COMCAST CORPORATION PEER-TO-PEER (P2P) TRANSMISSION CONTRACT LITIGATION | MDL No. 1992 |
| This Document Relates To: | Civil Action No. 2:08-MD-1992-LDD |
| All Actions | |

## CLASS ACTION SETTLEMENT AGREEMENT

This Class Action Settlement Agreement (the "Agreement") is made and entered into by and among Plaintiff Jon Hart ("Plaintiff"), on behalf of himself and the Releasing Parties, and Comcast Corporation, on behalf of itself and the Released Parties (individually a "Party" and collectively the "Parties").

## RECITALS

### I.   PRODEDURAL BACKGROUND

**WHEREAS**, in November 2007, Plaintiff commenced this Action in the Superior Court of California, Alameda County, asserting claims for damages and injunctive and declaratory relief against Comcast arising out of or related to Comcast's management of P2P file-sharing traffic on its high-speed Internet network and its disclosure of those network management practices; and

**WHEREAS**, in December 2007, Comcast timely answered the Complaint, denied any wrongdoing or liability in this Action, and then removed this Action to the United States District Court for the Northern District of California pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (2005); and

EXHIBIT "C"                                                                                    1

**WHEREAS**, in March 2008, Comcast moved for the entry of judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) or, in the alternative, for a stay of this Action pursuant to the primary jurisdiction doctrine during the pendency of the FCC proceeding; and

**WHEREAS**, in June 2008, the United States District Court for the Northern District of California granted Comcast's request for a stay of all claims during the pendency of the FCC proceeding and took no position on the merits of Plaintiff's claims or Comcast's defenses; and

**WHEREAS**, to date, at least seven (7) substantially similar Related Actions have been filed by other plaintiffs and other counsel against Comcast; and

**WHEREAS**, in August 2008, Comcast petitioned the Judicial Panel on Multidistrict Litigation to coordinate this Action and the Related Actions for pretrial purposes because they all allege substantially similar facts and assert substantially similar claims for relief, and Plaintiff and certain other plaintiffs in the Related Actions joined in that petition to the extent Comcast had requested coordination for pretrial purposes; and

**WHEREAS**, in December 2008, the Judicial Panel on Multidistrict Litigation transferred this Action and the Related Actions to the United States District Court for the Eastern District of Pennsylvania for coordinated pretrial proceedings; and

**WHEREAS**, the claims and allegations in this Action involve issues that are related to those in an administrative proceeding before the Federal Communications Commission ("FCC"), in which the FCC was asked to determine whether Comcast's network management practices violated the FCC's "Internet Policy Statement." *See In re Petition of Free Press for Declaratory Ruling that Degrading an Internet Application Violates the FCC's Internet Policy Statement and Does Not Meet an Exception for "Reasonable Network Management,"* WC Docket No. 07-52

SETTLEMENT AGREEMENT – PAGE 2 OF 35

EXHIBIT "C"                                                                     2

(Nov. 1, 2007); *In re Vuze, Inc., Petition to Establish Rules Governing Network Management Practices by Broadband Network Operators*, WC Docket No. 07-52 (Nov. 14, 2007); and

**WHEREAS**, in August 2008, the FCC issued its decision, by a 3-2 vote, in which it found that Comcast's network management practices did not comport with the FCC's "Internet Policy Statement"; and

**WHEREAS**, in its August 2008 Memorandum Opinion and Order, the FCC directed Comcast to implement protocol-agnostic network management no later than December 31, 2008 and to make particularized disclosures to Account Holders and the public concerning its network management practices; and

**WHEREAS**, the FCC's decision resulted in four separate appeals filed by Vuze Inc., the Consumers Union, the Pennsylvania Public Interest Research Group and Comcast, all of which were consolidated by the Judicial Panel on Multidistrict Litigation, assigned to the United States Court of Appeals for the District of Columbia Circuit, and remain pending; and

**WHEREAS**, in September 2008, despite denying any wrongdoing or liability, and despite the pendency of four consolidated appeals from the FCC decision, including its own, Comcast nonetheless voluntarily complied with the FCC decision, submitting detailed public disclosures to the FCC about its current and future network management practices and also submitting a detailed compliance plan describing its previously-announced plan to voluntarily deploy protocol-agnostic network management practices no later than December 31, 2008.

## II.   PLAINTIFF'S CLAIMS AND COMCAST'S REMEDIAL MEASUARES

**WHEREAS**, Plaintiff alleges that Comcast interfered with certain P2P internet applications while at the same time advertising unfettered access to the internet; and

EXHIBIT "C"                                                                                               3

**WHEREAS**, Plaintiff claims that such conduct violated the terms of Comcast's contracts as well as state unfair competition and false advertising laws; and

**WHEREAS**, Plaintiff further claims that Comcast's interference with certain P2P internet applications was both unauthorized and damaging to Plaintiff and the putative class in violation of federal law and the policy of network neutrality; and

**WHEREAS**, Comcast denies in all respects Plaintiff's claims; and

**WHEREAS**, despite denying any wrongdoing or liability, and while continuing to assert the need for network management techniques to minimize network congestion in the face of limited bandwidth, Comcast has nonetheless taken certain steps that addressed the allegations above in three principal ways: (1) by revising and enhancing its disclosures regarding its network management practices; (2) by changing its network management practices to a protocol agnostic approach; and (3) by increasing its network capacity and bandwidth:

- **Revised Disclosures.** In January 2008, Comcast revised its Acceptable Use Policy to explain that it "uses various tools and techniques to manage its network" including "temporarily delaying peer-to-peer sessions (or sessions using other applications or protocols)" and "limiting the number of peer-to-peer sessions," among others. In June 2008, Comcast introduced a webpage on the www.comcast.net website that provides information to current and potential subscribers regarding its network management practices. *See* http://www.comcast.net/terms/network. Comcast also revised its Answers to Frequently Asked Questions, which now provide greater detail to current and potential subscribers concerning its network management practices. *See* http://lite.help.comcast.net/content/faq/Frequently-Asked-Questions-about-Network-Management ("Comcast uses various tools and techniques to manage its network. . . . For example, these network management activities may include . . . (iii)

SETTLEMENT AGREEMENT – PAGE 4 OF 35

temporarily delaying peer-to-peer sessions (or sessions using other applications or protocols) that

users of the Service may wish to establish during periods of high network congestion, (iv)

limiting the number of peer-to-peer sessions users of the Service may establish, and (v) using

other tools and techniques that Comcast may be required to implement in order to meet its goal

of delivering the best possible broadband Internet experience to all of its customers. . . .

Comcast may on a limited basis temporarily delay certain P2P traffic when that traffic has, or is

projected to have, an adverse effect on other customers' use of the service.  Comcast manages

certain P2P traffic specifically because, in certain situations, that type of traffic consumes a

disproportionately large amount of network resources.").  In October 2008, Comcast further

revised its Acceptable Use Policy and gave notice of the revisions by posting a preview of the

revised version on the www.comcast.net website and by emailing notice to then-current Account

Holders.  In January 2009, Comcast further revised its Acceptable Use Policy and gave notice of

the revisions by posting the revised version on the www.comcast.net website and by promoting it

on the www.comcast.net and www.comcast.net/security webpages; and

- **Revised Network Management Practices.**  In March 2008, Comcast announced

that it would voluntarily migrate all of its systems to protocol-agnostic network management no

later than December 31, 2008.  In furtherance of this announcement, Comcast began testing

several protocol-agnostic network management techniques in June 2008.  The details of its

revised network management practices have been made publicly available in several places,

including the www.comcast.net/terms/network webpage.  In addition, Comcast introduced a new

webpage on the www.comcast.net website to monitor the implementation of the new practices.

*See* http://networkmanagement.comcast.net/transition/visualprogress.htm.  Comcast has now

completed the deployment of its protocol-agnostic network management practices.  *See*

SETTLEMENT AGREEMENT – PAGE 5 OF 35

http://downloads.comcast.net/docs/comcast-nm-transition-notification.pdf.  Accordingly,

Comcast no longer manages its high speed data network on the basis of whether data traffic is

P2P traffic or a particular type of P2P traffic; and

- **Increased Network Capacity.**  In January 2008, Comcast announced that it

would begin upgrading its network from broadband to wideband by deploying DOCSIS 3.0, a

new and improved standard for delivering high-speed Internet service at higher speeds.  In April

2008, Comcast announced that it had successfully deployed DOCSIS 3.0 in the Twin Cities

Region, enabling subscribers in that region to enjoy download speeds of up to 50 Mbps and

upload speeds of up to 5 Mbps.  Comcast's deployment of DOCSIS 3.0 has continued through

December 2008 and is ongoing.

### III.  GENERAL RECITALS

WHEREAS, Comcast has denied and continues to deny any wrongdoing or liability in

this Action, in the Related Actions, and in the FCC proceeding and the resulting appeals; and

WHEREAS, Class Counsel have investigated and examined the facts and law relating to

their claims against and the defenses of Comcast; and

WHEREAS, taking into account their investigation and examination of the facts and law,

the uncertainties and costs associated with protracted complex litigation, and Comcast's efforts

to voluntarily revise its network management practices and disclosures and comply with the FCC

decision, Class Counsel have concluded that this settlement is the most fair and efficient way to

resolve the claims of the Plaintiff and the Settlement Class; and

WHEREAS, Comcast, without admitting or determining liability, fault or wrongdoing,

has similarly concluded that settlement is desirable in order to avoid the time, risk and expense

EXHIBIT "C"                                                                                      6

of defending multiple and protracted litigation, and to resolve finally, completely and globally the pending and potential claims of the Plaintiff and the Settlement Class; and

**WHEREAS**, the Parties engaged in extensive arms-length negotiations and multiple sessions with Professor Eric Green of Resolutions LLC in his capacity as the Mediator; and

**WHEREAS**, as a result of those negotiations and mediations, the Parties have reached this Agreement, which the Parties believe provides substantial benefits and is fair to, and is in the best interests of, the Plaintiff and the Settlement Class; and

**WHEREAS**, the Parties agree that all Class Members shall have an individual right to opt out of the settlement, such that participation in and receipt of the benefits of the settlement shall be voluntary;

**NOW, THEREFORE**, subject to the Final Approval of the Court as required herein and by applicable law and rules, the Parties hereby agree, in consideration of the mutual promises and covenants contained herein, that any Released Claims against any Released Parties shall be settled, compromised and forever released upon the following terms and conditions.

## TERMS AND CONDITIONS

### I.    DEFINITIONS

As used in this Agreement and the exhibits hereto, in addition to any definitions set forth elsewhere in this Agreement, the following terms shall have the meanings set forth below:

**A.    "Action"**

"Action" means the civil action captioned Hart, et al. v. Comcast of Alameda, Inc., et al., commenced in the Superior Court of California, Alameda County and assigned Civil Action Number 07355993, removed to the United States District Court for the Northern District of California and assigned Civil Action Number 07-6350-PJH, and then transferred to the United

SETTLEMENT AGREEMENT – PAGE 7 OF 35

States District Court for the Eastern District of Pennsylvania for coordinated pretrial purposes in

the multidistrict litigation proceeding assigned Civil Action Number 2:08-MD-1992-LDD.

**B.      "Account Holder"**

"Account Holder" means any Person with an account for Internet service from Comcast

in any U.S. State or Territory in which Comcast offers or has offered Internet service.

**C.      "Approved Claim"**

"Approved Claim" means a claim made by a Claimant that complies in all respects with

the terms and conditions of this Agreement, that satisfies all prerequisite for credit or payment as

described in Sections VI.C and VI.D below, that has been preliminarily approved as being

timely, truthful and complete by the Claims Administrator pursuant to Section VI.E.1 below,

and, if applicable, that has been finally approved as being timely, truthful and complete by the

Mediator and/or Special Master pursuant to Section VI.E.2 below.

**D.      "Claimant"**

"Claimant" means a Person or entity that submits a Claim Form.

**E.      "Claim Form"**

"Claim Form" means the Court-approved form used by Claimants to make claims.

**F.      "Claims Administration Expenses"**

"Claims Administration Expenses" means the expenses incurred by the Claims

Administrator in the processing, handling, reviewing and paying of claims made by Claimants

and all reasonable fees and costs to be charged by the Mediator and/or Special Master pursuant

to Section VI.E below.

**G.**    **"Claims Administrator"**

"Claims Administrator" means the Person selected by the Parties and approved by the Court to oversee, among other things, the processing, handling, reviewing, approving and paying of claims made by Claimants.

**H.**    **"Class Counsel"**

"Class Counsel" means attorneys Mark N. Todzo and Eric S. Somers of Lexington Law Group LLP and David R. Scott and Christopher M. Burke of Scott + Scott LLP.

**I.**    **"Class Members"**

"Class Members" means members of the Settlement Class.

**J.**    **"Class Notice"**

"Class Notice" means the Court-approved notices of this Agreement that are directed to the Settlement Class.

**K.**    **"Comcast"**

"Comcast" means Comcast Corporation and all of its current and former parents, affiliates, subsidiaries, predecessors, successors, assigns, and related entities, including, without limitation, Comcast Cable Communications Holdings, Inc., Comcast Cable Communications, LLC, Comcast Cable Communications Management, LLC, and any entity currently or formerly named as a defendant in the Action or Related Actions.

**L.**    **"Court"**

"Court" means the United States District Court for the Eastern District of Pennsylvania.

**M.**  **"Effective Date"**

    "Effective Date" means the date on which the Final Approval is not subject to appeal or, in the event of a timely appeal from the Final Approval, the date on which the appeal is resolved and the Final Approval is not subject to further review.

**N.**  **"Fairness Hearing"**

    "Fairness Hearing" means the hearing to be conducted by the Court to determine the fairness, adequacy and reasonableness of this Agreement.

**O.**  **"Fee Award"**

    "Fee Award" means the award of fees and costs sought by application to and approved by the Court that is payable to Class Counsel.

**P.**  **"Final Approval"**

    "Final Approval" means the Court's entry of a final order approving the settlement pursuant to the terms and conditions of this Agreement, confirming the certification of the Settlement Class, dismissing the Action with prejudice, and otherwise directing as the Court or the Parties deem necessary and appropriate in order to effectuate the terms and conditions of this Agreement.

**Q.**  **"Incentive Award"**

    "Incentive Award" means any award sought by application to and approved by the Court that is payable to Plaintiff.

**R.**  **"Mediator"**

    "Mediator" means Eric Green of Resolutions LLC.

S.   **"Notice Expenses"**

"Notice Expenses" means all reasonable costs and expenses expended in disseminating the Class Notice and providing notice to the appropriate State and Federal officials, including: (i) preparing, printing, mailing, disseminating, posting, promoting, internet hosting and publishing the Class Notice; (ii) identifying and notifying Class Members; (iii) obtaining any expert opinions regarding the sufficiency of notice program described in Section III below; and (iv) any other necessary notice or notice-related activities.

T.   **"P2P"**

"P2P" means peer-to-peer transmissions over a data network by a group of users sharing and transferring content such as large high-definition video and audio files.

U.   **"Person"**

"Person" means any individual, corporation, trust, partnership, limited liability company or other legal entity and their respective successors or assigns.

V.   **"Preliminary Approval"**

"Preliminary Approval" means the Court's entry of an order approving the timing, content and manner of Class Notice, conditionally certifying the Settlement Class, preliminarily approving this Agreement, and enjoining the commencement or continued prosecution by any Releasing Party of any Released Claim against any Released Party.

W.   **"Related Actions"**

"Related Actions" means the actions filed in other state or federal courts asserting claims and alleging facts substantially similar to those asserted and alleged in this Action, including but not limited to the following: Tan v. Comcast Corp., No. 08-2735 (E.D. Pa.); Lis v. Comcast of Chicago Corp. et al., No. 08-3984 (N.D. Ill.); Libonati v. Comcast Cablevision of Jersey City,

Inc., et al., No. 08-3518 (D.N.J.); Leigh v. Comcast of California II, Inc., et al., No. 08-4601

(C.D. Cal.); Topolski v. Comcast Corp. et al., No. 08-852 (D. Or.); Sidner v. Comcast of the

District LLC, No. 2008 CA-001180-B (D.C. Super. Ct.); and Aliano v. Comcast of Chicago,

Inc., et al., No. 08-5320 (N.D. Ill.).

**X.    "Released Claim"**

"Released Claim" means any claim, liability, right, demand, suit, matter, obligation,

damage, loss or cost, action or cause of action, of every kind and description that the Releasing

Party had or has, including assigned claims, whether known or unknown, asserted or unasserted,

latent or patent, that is, has been, could reasonably have been or in the future might reasonably

be asserted by the Releasing Party either in the Action or in the Related Actions or in any action

or proceeding in this Court or any other court or forum, regardless of legal theory, and regardless

of the type or amount of relief or damages claimed, against any of the Released Parties arising

out of or relating to Comcast's management of P2P or Lotus Notes on its network prior to the

Effective Date, Comcast's disclosures related to those practices prior to the Effective Date, or

Comcast's advertisements or representations concerning the nature, existence or non-existence of

any limitations or restrictions on the use or speed of the Comcast service or the ability or

inability to access or make use of the Internet prior to the Effective Date, including but not

limited to all claims that were brought or could have been brought in the Action or the Related

Actions.  Without limiting the generality of the foregoing, Released Claims shall include, with

regard to the foregoing subject matter: (1) any class, group, collective or individual claim for any

breach or violation of any federal or state statute, case law, common law or other law; (2) any

claim for breach of any duty imposed by law, by contract or otherwise; and (3) any claim for

damages, injunctive relief, declaratory relief, class damages or relief, penalties, punitive

damages, exemplary damages, restitution, rescission or any claim for damages based upon any

multiplication or enhancement of compensatory damages arising out of or relating to the above.

**Y.    "Released Party"**

"Released Party" means Comcast, as defined above, and each of Comcast's predecessors,

successors, assigns, parents, subsidiaries, divisions, departments, and affiliates, and any and all

of their past, present and future officers, directors, employees, stockholders, partners, agents,

servants, successors, attorneys, representatives, subrogees and assigns of any of the foregoing.

**Z.    "Releasing Party"**

"Releasing Party" means the Plaintiff, each Class Member, and any Person claiming by

or through him/her/it as his/her/its spouse, child, heir, associate, co-owner, attorney, agent,

administrator, devisee, predecessor, successor, assignee, representative of any kind, shareholder,

partner, director, employee, or affiliate.

**AA.    "Request for Exclusion"**

"Request For Exclusion" is the written communication that a Class Member may submit

to the Claims Administrator in order to be excluded from the Settlement Class.

**BB.    "Request for Objection"**

"Request for Objection" is the written communication that a Class Member may file with

the Court in order to object to this Agreement.

**CC.    "Settlement Class"**

"Settlement Class" means all current and former Account Holders who either: (1) used or

attempted to use the Comcast service in order to use the Ares, BitTorrent, eDonkey, FastTrack or

Gnutella P2P protocols at any time from April 1, 2006 to December 31, 2008; or (2) used or

attempted to use the Comcast service in order to use Lotus Notes to send emails at any time from

March 26, 2007 to October 3, 2007. Excluded from the Settlement Class are: Comcast; any

parent, affiliate, subsidiary, predecessor, successor, assign or related entity of Comcast; any

officer, director, agent, servant, or employee of Comcast; any officer, director, agent, servant, or

employee of any parent, affiliate, subsidiary, predecessor, successor, assign or related entity of

Comcast; any judge presiding over any of the actions that together comprise the Action or

Related Actions; and any immediate family member of any such person(s).

**DD.** **"Settlement Website"**

"Settlement Website" means the dedicated website to be administrated by the Claims

Administrator for purposes of receiving Claim Forms and providing notice and other information

regarding this Agreement to Class Members and others.

## II.     PRELIMINARY APPROVAL

**A.** **Motion for Preliminary Approval**

Following execution of this Agreement, Class Counsel shall promptly submit this

Agreement to the Court and petition the Court for an order that: (1) appoints the Plaintiff to

represent the Settlement Class; (2) appoints Class Counsel to represent the Settlement Class; (3)

appoints Rust Consulting as the Claims Administrator; (4) conditionally certifies the Settlement

Class under Federal Rule of Civil Procedure 23 for settlement purposes only; (5) preliminarily

approves this Agreement for purposes of issuing Class Notice; (6) approves the timing, content

and manner of the Class Notice; (7) allows for appropriate confirmatory discovery by Class

Counsel; (8) enjoins the commencement or continued prosecution by any Releasing Party of any

Released Claim against any Released Party; (9) schedules the Fairness Hearing pursuant to

Section VIII.B below; and (10) makes such orders as are necessary and appropriate to effectuate

the terms and conditions of this Agreement.

**B.**    <u>Stay of this Action</u>

Following Preliminary Approval, all activity in the Action shall be stayed except to the extent necessary to effectuate this Agreement unless and until this Agreement is terminated pursuant to its terms and conditions.

**C.**    <u>Stay of Related Actions</u>

Following Preliminary Approval, Class Counsel shall cooperate with and assist Comcast in seeking a stay of the Related Actions pending Final Approval.

**D.**    <u>Cooperation</u>

The Parties shall cooperate in good faith and undertake all reasonable actions and steps in order to accomplish the events described in this Section.

### III.    <u>NOTICE</u>

**A.**    <u>Cost of Notice</u>

All Notice Expenses shall be paid from the Settlement Fund to be established by Comcast pursuant to Section V below.

**B.**    <u>Timing of Notice</u>

**1.    Notice to State and Federal Officials**

Notice of the terms of this Agreement shall be provided by Comcast to the appropriate federal official and state official in each State in which Comcast offered Internet service during the relevant time period no later than ten (10) days after this Agreement is filed with the Court for preliminary approval as required by the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (2005) ("CAFA").

**2.    Notice to the Settlement Class**

Upon Preliminary Approval of this Agreement, the Parties or their designees shall cause the Class Notice to be made as follows.

SETTLEMENT AGREEMENT – PAGE 15 OF 35

EXHIBIT "C"                                                          15

a.    **Publication Notice**

Class Notice shall be made by publication in the manner set forth below no later than

ninety (90) days after Preliminary Approval.

b.    **Billing Notice**

Class Notice shall be made by bill insert in the manner set forth below no later than one-

hundred and twenty (120) days after Preliminary Approval.

c.    **Website Notice**

Class Notice shall be made on the Settlement Website in the manner set forth below no

later than seven (7) days after Preliminary Approval.  Electronic Claim Forms shall be made

available on the Settlement Website no later than twenty-one (21) days after Preliminary

Approval.

C.    <u>**Manner of Notice**</u>

1.    **Notice to State and Federal Officials**

Notice to the appropriate federal and state officials pursuant to CAFA shall provide those

officials with electronic copies of the documents enumerated in Section III.D.1 below, which

shall be mailed to them via certified mail.

2.    **Notice to the Settlement Class**

Upon Preliminary Approval of this Agreement, the Parties or their designees shall cause

the Class Notice to be made as follows.

a.    **Publication Notice**

i.    **People Magazine**

Class Notice shall be made by Kinsella Media LLC by publishing one (1) full page size

(7" x 10") notice in one (1) issue of People Magazine, a weekly magazine that has an

SETTLEMENT AGREEMENT – PAGE 16 OF 35

approximate weekly circulation of 3,450,000 issues and an approximate weekly readership of 42,427,000 individuals across the country.

### ii.    Maxim Magazine

Class Notice shall be made by Kinsella Media LLC by publishing one (1) two-thirds page size (4 ½" x 10 ½") notice in one (1) issue of Maxim Magazine, a monthly magazine that has an approximate monthly circulation of 2,500,000 issues and an approximate monthly readership of 13,250,000 individuals across the country.

### iii.    Yahoo Websites

Class Notice shall be made by Kinsella Media LLC by publishing banner advertisements with links to the Settlement Website on the network of Yahoo websites, a leading web portal with an approximate monthly audience of 37,00,000 individuals across the country.

### iv.    24/7 Real Media Websites

Class Notice shall be made by Kinsella Media LLC by publishing banner advertisements with links to the Settlement Website on certain websites affiliated with 24/7 Real Media, a leading digital advertising company whose affiliated websites have an approximate monthly audience of 11,000,000 individuals across the country.

### v.    Microsoft Media Networks Websites

Class Notice shall be made by Kinsella Media LLC by publishing banner advertisements with links to the Settlement Website on certain websites affiliated with Microsoft Media Networks, a leading digital advertising company whose affiliated websites have an approximate monthly audience of 8,000,000 individuals across the country.

### b.    Billing Notice

Class Notice shall be made by Comcast by including one (1) bill insert with one (1) monthly bill to the billing address (home or email) on file for each then current Account Holder.

SETTLEMENT AGREEMENT – PAGE 17 OF 35

### c.    Website Notice

Class Notice shall be made by the Claims Administrator by posting the Class Notice on a webpage of the Settlement Website, which shall be supported by search engines directing Internet searches to the website.  The Parties shall agree on all content to be posted on the Settlement Website.

## D.    Contents of Notice

### 1.    Notice to State and Federal Officials

Notice to federal and state officials shall contain electronic copies of the following documents in this Action and, to the extent required by CAFA, in the Related Actions: (1) the complaint(s); (2) any notice(s) of any scheduled judicial hearings; (3) any proposed notice(s) to the Settlement Class; (4) any proposed or final settlement agreement(s); (5) any and all other agreement(s) between Settlement Class Counsel and counsel for Comcast; (6) any and all final judgment(s) or notice(s) of dismissal; (7) a reasonable estimate of the number of Class Members that reside in each State; and (8) any written judicial opinion(s).  This notice may indicate that the information called for by Section III.D.1.7 is confidential and shall only be disclosed pursuant to an appropriate and mutually agreeable Confidentiality Agreement.

### 2.    Notice to the Settlement Class

The Class Notice shall advise Class Members of their rights, including the right to opt-out from or object to this Agreement and the applicable procedures for doing so, shall direct them to the Settlement Website where electronic Claim Forms shall be located, shall provide instructions for contacting Class Counsel and the Claims Administrator in order to obtain paper Claim Forms or otherwise, and shall contain other information as is agreed by the Parties.  The Class Notice shall advise Class Members that objections to the Agreement, and papers submitted in support of said objections, shall only be considered at the Fairness Hearing if they are

submitted pursuant to the procedures set forth in Section IV.A below. The Class Notice shall advise Class Members that the time and place of the Fairness Hearing may change and shall be posted on the Settlement Website in advance of the Fairness Hearing. The Class Notices to be made by publication, bill insert, and website shall contain text substantially similar to the jointly-prepared and mutually-agreed forms attached hereto as Exhibits 1 through 3, respectively. The Parties agree that the size, format and/or layout of the Class Notices may be modified by mutual agreement of the Parties without the need for Court approval, provided that any such modifications are consistent with the general intent of this Agreement.

E.    **Sufficiency of Notice**

The Parties have reviewed the timing, manner, and content of the Class Notice and of the Claim Form and agree that they satisfy and comport with applicable requirements of due process, Federal Rule of Civil Procedure 23, and the Federal Judicial Conference; that they are written in plain, easily understood language; that they provide for the best notice that is practicable under the circumstances; and that they are reasonably calculated to apprise Class Members of the pendency of this Action, the existence of this Agreement, their right to object to or opt-out of this Agreement, and their right to avail themselves of the rights created by this Agreement.

## IV.    OBJECTIONS AND OPT-OUTS

A.    **Objections**

1.    **Right to Object**

Any Class Member who intends to object to this Agreement must file a Request for Objection with the Court, must submit a copy to the Claims Administrator, and must serve a copy, by regular mail, hand or overnight delivery, to both Class Counsel and Comcast's counsel at the addresses provided in Section XIV.B below. The Request for Objection must be post-marked no later than one-hundred and fifty (150) days after Preliminary Approval. The deadline

SETTLEMENT AGREEMENT – PAGE 19 OF 35

to submit the Request for Objection shall be set forth in the Class Notice. The Request for Objection must include the objector's name and address and all arguments, citations, and evidence supporting the objection, and must state whether the objector intends to appear at the Fairness Hearing, either with or without counsel. Class Members who fail to submit a timely or complete Request for Objection pursuant to this paragraph or as detailed in the Class Notice shall be deemed to have waived all objections to this Agreement, shall not be permitted to object to this Agreement at the Fairness Hearing or otherwise, and shall be foreclosed from challenging this Agreement or seeking appellate review of the Final Approval by appeal or otherwise. Only Class Members may object to this Agreement.

### 2.    Right to Respond

Class Counsel and Comcast shall have the right to respond to any Request for Objection no later than seven (7) days prior to the Fairness Hearing. The Party so responding shall file a copy of the response with the Court, shall submit a copy to the Claims Administrator, and shall serve a copy, by regular mail, hand or overnight delivery, to the objector and to counsel for the other Party at the address provided in Section XIV.B below.

## B.    Opt Outs

### 1.    Right to Opt Out

A Class Member who intends to opt out of the settlement must submit a Request for Exclusion to the Claims Administrator. The Request for Exclusion must be post-marked no later than one-hundred and fifty (150) days after Preliminary Approval. The deadline to submit the Request for Exclusion shall be set forth in the Class Notice. Class Members who do not opt out shall be bound by this Agreement and any judgments or orders entered in this Action. Class Members who do opt out shall not (a) be bound by this Agreement or any orders or judgments in this Action; (b) be entitled to relief under or be affected by this Agreement; (c) gain any rights by

virtue of this Agreement; or (d) be entitled to object to any term or condition of this Agreement. The Request for Exclusion must be personally signed by the Class Member. So-called "mass" or "class" opt-outs shall not be allowed.

### 2.    Right to Terminate

If more than 5,000 Class Members submit timely and valid Requests for Exclusion, Comcast shall have the right to terminate this Agreement pursuant to Section IX.A below.

## V.    SETTLEMENT FUND

### A.    Settlement Fund

Comcast shall open a segregated, interest-bearing account ("the Settlement Fund") that shall consist of no more than Sixteen Million Dollars ($16,000,000) and shall be used to pay Notice Expenses, Claims Administration Expenses, and Approved Claims, including claims paid by check by the Claims Administrator pursuant to Section VI.F.2 below and claims paid by billing credits by Comcast pursuant to Section VI.F.1 below.

### B.    Initial Funding

The Claims Administrator shall provide Comcast with payment instructions consistent with the terms of this Agreement for funding the Settlement Fund. No later than thirty (30) days after Preliminary Approval, Comcast shall deposit Five Million Dollars ($5,000,000.00), by wire transfer, into the Settlement Fund.

### C.    Additional Funding

If at any time the Notice Expenses, Claims Administration Expenses and Approved Claims for cash payments in the aggregate exceed the amount of money Comcast has deposited into the Settlement Fund, the Claims Administrator shall provide Comcast with payment instructions consistent with the terms of this Agreement for additional funding of the Settlement Fund and Comcast shall, no later than five (5) business days after receiving those instructions,

SETTLEMENT AGREEMENT – PAGE 21 OF 35

deposit the required additional funds in $100,000.00 increments, by wire transfer, into the Settlement Fund.

**D.    Maximum Funding**

Notwithstanding anything to the contrary in this Agreement, in no event shall the total amount of the deposits paid into the Settlement Fund exceed Sixteen Million Dollars ($16,000,000) less amounts paid by Comcast in billing credits pursuant to Section VI.F.1 below.

**E.    Reversion of Funds**

Any funds remaining in the Settlement Fund, including but not limited to any checks not cashed by Claimants by the deadline set forth in Section VI.F.2 below and any interest earned on funds in the Settlement Fund, after Claims Administration Expenses, Notice Expenses and Approved Claims have been paid or credited shall revert to Comcast no later than ninety (90) days after the payment of all such costs and claims. The Settlement Fund shall not be used to award any form of *cy pres* relief, disgorgement or similar aggregate relief. Comcast shall provide the Claims Administrator with written instructions regarding the distribution of any reversion.

## VI.    CLAIMS PROCESS

**A.    Claims Administration**

The Claims Administrator shall be responsible for administering the payment of claims by processing, handling, reviewing and resolving claims in a rational, responsive, cost effective and timely manner. The Claims Administrator shall maintain reasonably detailed records of its activities under this Agreement, make such records available to Class Counsel and Comcast, and provide reports and other information to the Court, including a report of all amounts paid to Claimants, as the Court may require. The Parties agree and jointly propose that Rust Consulting act as the Claims Administrator.

SETTLEMENT AGREEMENT – PAGE 22 OF 35

**B.     Cost of Claims Administration**

All Claim Administration Expenses shall be paid from the Settlement Fund to be established by Comcast pursuant to Section V above.

**C.     Claim Deadline**

Electronic Claim Forms must be received by the Claims Administrator and paper Claim Forms must be postmarked no later than sixty (60) days after Final Approval. The claim deadline shall be set forth in the Class Notice, Claim Forms and Settlement Website.

**D.     Claim Submission**

The claims process shall be conducted through the Settlement Website. Class Members who are unable to complete an online Claim Form may call a toll-free number to be established by the Claims Administrator, provide their name and address, and receive a paper Claim Form that may be completed and mailed to the Claims Administrator. The Claim Forms shall require Claimants to provide the following information: (1) whether the Claimant is a current or former Account Holder; (2) the Claimant's name, current address, current home telephone number, Comcast account number, and, if different than current address and telephone number, the address and home telephone number for the residence(s) at which the Comcast service was provided; (3) a certification that the Claimant either (a) used or attempted to use the Comcast service in order to use the Ares, BitTorrent, eDonkey, FastTrack or Gnutella P2P protocols to share computer files at any time from April 1, 2006 to December 31, 2008 and was unable to share such files and/or has a factual basis for believing that the speed at which such files were shared was impaired; and/or (b) attempted but were unable to use the Comcast service in order to use Lotus Notes to send emails at any time from March 26, 2007 to October 3, 2007; (4) a certification of the name(s) of the P2P protocol(s), if applicable, that the Claimant used or attempted to use during the relevant time period; (5) a certification that the Claimant has not

SETTLEMENT AGREEMENT – PAGE 23 OF 35

previously requested or received a refund on or credit to the Claimant's account arising out of or related to Comcast's management of P2P file-sharing traffic or Lotus Notes on its high-speed Internet network or Comcast's disclosure of its network management practices; (6) a certification that the use or attempted use of P2P protocols to share computer files and/or Lotus Notes to send emails was for a lawful purpose consistent with applicable copyright and other laws; and (7) a certification, under oath and/or penalty of perjury, that the information provided in the Claim Form is true and correct. The Claim Forms shall contain text substantially similar to the jointly-prepared and mutually-agreed form attached hereto as Exhibit 4.

E.    **Claim Approval**

    1.    **Preliminary Approval**

The Claims Administrator shall be preliminarily responsible for determining whether a Claimant has made an Approved Claim, and shall reject any claims not submitted in accordance with Sections VI.C and VI.D above. Notwithstanding the foregoing, the Claims Administrator may, in its discretion, permit Claimants to remedy minor deficiencies in their Claim Forms, and may, in its discretion, request additional information from Claimants in order to review their claims. Should the Claims Administrator determine that certain claims, although submitted in accordance with Sections VI.C and VI.D above, are nevertheless suspicious or anomalous, the Claims Administrator may challenge such claims and request additional information from the Claimant. The Claims Administrator shall maintain records of its decisions approving or disapproving of individual claims and shall make such records available to Comcast, Class Counsel and the Court.

    2.    **Challenges to Claim Approval and Claim Process**

Either Party shall have the right to challenge any errors or abuses made by the Claims Administrator in the processing, handling, reviewing, approving and paying of claims. The

SETTLEMENT AGREEMENT – PAGE 24 OF 35

Claim Form shall disclose that claims may be questioned, that either Party has the right to challenge the Claims Administrator's decision denying or approving claims, and that additional information may be requested in order to permit any additional review that may be required. Any such challenges shall be submitted to the Mediator, who shall decide the matter in a timely fashion or appoint a Special Master to decide the matter in a timely fashion. The Claims Administrator shall thereafter comply with the decision of the Mediator or Special Master.

**F.    Claim Payment**

Class Members who submit Approved Claims shall be entitled to receive settlement benefits as set forth below.

**1.    Current Account Holders**

Claimants who submit an Approved Claim and are current Account Holders at the time claims are paid shall receive a billing credit in the amount of the lesser of: (a) Sixteen Dollars ($16.00); or (b) their pro rata share of the maximum Settlement Fund less the Notice Expenses and the Claims Administration Expenses. Comcast shall use its best efforts to issue such billing credits no later than one-hundred and twenty (120) days after the Effective Date, and shall submit a report to Class Counsel and the Claims Administrator listing current Account Holders and the amount and date that the billing credit was made to them within one-hundred and fifty (150) days after the Effective Date.

**2.    Former Account Holders**

Claimants who submit an Approved Claim and are former Account Holders at the time claims are paid shall receive a check in the amount of the lesser of: (a) Sixteen Dollars ($16.00); or (b) their pro rata share of the maximum Settlement Fund less the Notice Expenses and the Claims Administration Expenses. The Claims Administrator shall issue such checks no later

than one-hundred and twenty (120) days after the Effective Date. Checks shall be cashed no later than ninety (90) days after their issuance or shall be deemed null and void and shall revert to the Settlement Fund.

**G.     Claims Process Modification**

The Parties agree that the claims process set forth in this Section may be modified by mutual agreement of the Parties without the need for Court approval, provided that any such changes are consistent with the general intent of this Agreement and do not result in additional burden on or expense to individual Claimants or any reapportionment of settlement funds.

## VII.     FEE AND INCENTIVE AWARDS

**A.     The Fee Award**

In addition to and separate from the consideration provided to Claimants in Section VI.F, Comcast agrees to and shall pay Class Counsel, subject to Court approval, a Fee Award not to exceed Three Million Dollars ($3,000,000) (the "Maximum Fee Award"). Comcast shall neither object to nor challenge Class Counsel's application for an award of fees and costs at or below the Maximum Fee Award and Class Counsel shall neither request nor accept from the Court an award of fees and costs more than the Maximum Fee Award. Comcast and Class Counsel agree that the Maximum Fee Award is a fair and reasonable award of fees and costs.

**B.     Payment of the Fee Award**

Notwithstanding the filing of any appeal, objection or challenge to the Agreement or the Fee Award, Comcast shall pay the Fee Award, by wire transfer, to Class Counsel no later than: (1) thirty (30) days after Final Approval if Class Counsel provides Comcast with reasonable and adequate security (as determined by Comcast) for the recovery of the Fee Award in the event the Final Approval and/or the Fee Award is vacated; or (2) thirty (30) days after the Effective Date. Class Members shall not be responsible for paying any part of the Fee Award. Notwithstanding

the foregoing, however, Class Members shall be responsible for paying their own attorneys' fees and costs incurred, if any, in connection with appealing from, objecting to or otherwise challenging this Agreement, the Fee Award, or the Preliminary or Final Approval.

**C.    The Incentive Award**

In addition to and separate from the consideration provided to Claimants in Section VI.F, Comcast shall pay the Plaintiff, subject to approval by the Court and in recognition of Plaintiff's time and effort expended on behalf of the Settlement Class, an Incentive Award in the amount of Two Thousand Five Hundred Dollars ($2,500).

**D.    Payment of the Incentive Award**

Comcast shall pay the Incentive Award by check made payable to the Plaintiff no later than thirty (30) days after the Effective Date.  Class Members shall not be responsible for paying any part of the Incentive Award.

## VIII.    FINAL APPROVAL

**A.    Motion for Final Approval**

No later than thirty (30) days before the Fairness Hearing, Class Counsel shall petition the Court for a final order that: (1) confirms the certification of the Settlement Class as defined above; (2) dismisses this Action, with prejudice, upon the Effective Date; (3) decrees that neither the Final Approval nor this Agreement constitutes an admission of liability, fault or wrongdoing; (4) enjoins the Releasing Parties from asserting any Released Claims against any Released Parties; (5) releases the Released Parties from the Released Claims of the Releasing Parties; (6) finds that this Agreement is entered into in good faith, is reasonable, fair and adequate, and is in the best interest of the Settlement Class; (7) preserves the Court's continuing and exclusive jurisdiction over the Parties, including Comcast and all Class Members, to administer, supervise, construe and enforce this Agreement in accordance with its terms and conditions, but without

EXHIBIT "C"                                                    27

affecting the finality of the Final Approval; and (8) making such orders as are necessary and appropriate to effectuate the terms and conditions of this Agreement.

**B.    Fairness Hearing**

No sooner than ninety (90) days after notice is provided to state and federal officials pursuant to Section III above, and no later than one-hundred and eighty (180) days after Preliminary Approval, the Court shall conduct a Fairness Hearing so that the Court may review any objections to this Agreement, consider the fairness, reasonableness and adequacy of this Agreement, consider Class Counsel's petition for a Fee Award, and consider Class Counsel's petition for Final Approval.  The date of the Fairness Hearing shall be posted on the Settlement Website in advance of the hearing.

**C.    Dismissal of this Action**

The Final Approval shall provide that this Action shall be dismissed, with prejudice, upon the Effective Date.

**D.    Dismissal of the Related Actions**

Following Final Approval, Class Counsel shall cooperate with and assist Comcast in seeking the dismissal, with prejudice, of the Related Actions.

**E.    Cooperation**

The Parties shall cooperate in good faith and undertake all reasonable actions and steps in order to accomplish the events described in this Section, to defend any appeal from an order granting Final Approval, to respond to any collateral attack on the settlement, this Agreement and/or its preclusive effect, and to take any appeal from an order denying Final Approval. Notwithstanding the foregoing, however, Comcast shall have no obligation to take any position with respect to amounts not awarded to Class Counsel as part of the Fee Award or to amounts not awarded to the Plaintiff as part of the Incentive Award.

SETTLEMENT AGREEMENT – PAGE 28 OF 35

## IX.    TERMINATION

### A.    Right to Terminate

This Agreement is contingent on the final certification of the Settlement Class and the Final Approval as defined above.  Comcast may terminate this Agreement in its entirety at any time and without further obligation if: (1) any court rejects or denies approval of any term or condition of this Agreement; (2) any court makes any order purporting to alter, amend or modify any term or condition of this Agreement; (3) any court fails to certify the Settlement Class as defined above; (4) any court makes any order purporting to preclude Plaintiff and/or Comcast from proceeding in whole or in part with any of the terms and conditions of this Agreement; or (5) more than 5,000 Class Members submit timely and valid Requests for Exclusion.

### B.    Notice of Termination

In the event Comcast exercises its right to terminate this Agreement, it shall promptly notify the Court and Class Counsel in writing and cause the Claims Administrator to notify the Settlement Class by posting information on the Settlement Website and by emailing information to those Claimants who provided an email address to the Claims Administrator.

### C.    Effect of Termination

In the event Comcast exercises its right to terminate this Agreement, this Agreement shall be considered null and void and have no force or effect, no person or entity shall be bound by any of its terms or conditions, and the rights of all persons or entities with respect to the claims and defenses asserted in this Action shall be restored to the positions existing immediately prior to execution of this Agreement.

## X.   **RELEASE**

A.   **Release**

Upon Final Approval, each Class Member who has not validly and timely opted out of the settlement shall be deemed to release and forever discharge any and all Released Parties of and from liability for any and all Released Claims, and shall be permanently barred and enjoined from initiating, asserting and/or prosecuting any Released Claim(s) against any Released Party in any court or forum.  This Agreement shall be the sole and exclusive remedy for any and all Released Claims against the Released Parties.  No Released Party shall be subject to liability or expense of any kind to any Releasing Party with respect to any Released Claim.

B.   **Binding Effect**

The Parties agree that they may hereafter discover facts in addition to or different from those they believe to be true with respect to the subject matter of this Agreement.  The Parties agree that, notwithstanding the discovery of the existence of any such additional or different facts that, if known, would materially affect its decision to enter into this Agreement, the releases herein given shall be and remain in effect as a full, final and complete general release of the Released Claims and the Parties shall not be entitled to modify or set aside this Agreement, either in whole or in part, by reason thereof.  The Parties hereby waive and relinquish, to the fullest extent permitted by law, the rights and benefits of any statute which might otherwise render unenforceable a release contained in this Agreement, including but not limited to Section 1542 of the California Civil Code, which provides as follows: "**A general release does not extend to claims which the creditor does not  know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.**"

Settlement Agreement – Page 30 of 35

EXHIBIT "C"                                                                                                30

## XI.    SETTLEMENT PURPOSES ONLY

### A.    Non-Admission

This Agreement, whether or not consummated, and any communications exchanged or actions taken pursuant to or during the negotiation of this Agreement are for settlement purposes only.  Neither the fact of nor the contents of this Agreement or its exhibits, nor any communications exchanged nor actions taken pursuant to or during the negotiation of this Agreement, shall constitute, be construed as, or be admissible in evidence as an admission of the validity of any claim asserted or fact alleged in this Action or the Related Actions or of any wrongdoing, fault, violation of law or liability of any kind on the part of Comcast.

### B.    Non-Admissibility

This Agreement and all negotiations, correspondence and communications leading up to its execution shall be deemed to be within the protection of Federal Rule of Evidence 408 and any analogous state or federal rules or principles.  Neither this Agreement, nor any terms, conditions, contents or provisions hereof or exhibits hereto, nor any negotiations, correspondence or communications leading up to the execution of this Agreement, shall constitute a precedent or be admissible for any purpose in any proceeding; provided, however, that this Agreement shall be admissible in any proceeding related to the approval of this Agreement, to enforce any of its terms and conditions, to support or defend this Agreement in an appeal from an order granting or denying Final Approval, or to enforce or assert a claim or defense of res judicata, collateral estoppel, claim preclusion, issue preclusion, settlement, release, merger and bar, or any similar claim or defense against the Plaintiff, any Class Member, or any third party.

### C.    Reservation of Rights

This Agreement is made without prejudice to the rights of Comcast to: (1) seek to compel individual arbitration of any claim in any forum other than Released Claims by Releasing Parties

who have not opted out of the Settlement Class; (2) oppose certification in this Action should this Agreement not be approved or implemented; (3) oppose certification in the Related Actions or in any other putative or certified class action should those actions not be dismissed; or (4) use the certification of the Settlement Class to oppose certification of any other proposed or existing class arising out of or related to the Released Claims should those actions not be dismissed.

## XII.    WARRANTIES AND REPRESENTATIONS

### A.    Authority to Execute

The Parties warrant and represent that the persons executing this Agreement are duly authorized to do so.

### B.    Assignment of Claims

The Parties warrant and represent that no claim or any portion of any claim referenced or released in this Agreement has been sold, assigned, conveyed, or otherwise transferred to any other entity or Person.

### C.    Reading and Understanding

The Parties warrant and represent that they have carefully read this Agreement, have consulted their attorneys regarding this Agreement, and fully understand and voluntarily accept the terms and conditions of this Agreement.

### D.    Reliance on Own Judgment

The Parties warrant and represent that they have relied upon their own judgment and that of their legal counsel regarding the sufficient and agreed upon consideration for this Agreement and that no statement or representation by any of the other Parties or their agents, employees, officers, directors or legal representatives influenced or induced them to execute this Agreement.

## XIII.  INTERPRETATION AND ENFORCEMENT

**A.      Governing Law**

This Agreement shall be construed under and governed by the laws of the

Commonwealth of Pennsylvania, applied without regard to laws applicable to choice of law.

**B.      Entire Agreement**

This Agreement, including all exhibits hereto, shall constitute the entire Agreement

among the Parties with regard to the subject of this Agreement and shall supersede any previous

agreements, representations, communications and understandings among the Parties with respect

to the subject matter of this Agreement.

**C.      Joint Preparation**

This Agreement shall be construed as if the Parties jointly prepared it and any uncertainty

or ambiguity shall not be interpreted against any of the Parties.

**D.      Recitals**

The Recitals are a material part of this Agreement and are incorporated herein in their

entirety.

**E.      Captions**

The captions used in this Agreement are for convenience and identification purposes only

and are not part of this Agreement.

**F.      Modification**

This Agreement may not be changed, modified, or amended except in writing signed by

all Parties and approved by the Court.  Notwithstanding the foregoing, however, the claims

process set forth above may be modified by mutual agreement of the Parties without Court

approval pursuant to Section VI.G above, and the Parties may agree to reasonable extensions of

time in which to accomplish the tasks required by the terms and conditions of this Agreement, which shall not be unreasonably withheld.

**G.    Waiver**

The waiver of any term or condition or breach of this Agreement shall not be deemed to be a waiver of any other term or condition or breach of this Agreement and shall not be deemed to be a continuing waiver.

**H.    Binding Effect**

This Agreement shall be binding upon and inure to the benefit of the Parties and each of their respective heirs, successors, assigns, executors and legal representatives.

**I.    Continuing Jurisdiction**

The Parties agree that the Court shall retain exclusive and continuing jurisdiction of the Action, Parties, Class Members and the Claims Administrator to interpret and enforce the terms, conditions, and obligations of this Agreement.

## XIV.    MISCELLANEOUS TERMS AND CONDITIONS

**A.    Confirmatory Discovery**

In addition to the discovery received and investigation conducted by Class Counsel, Comcast shall permit Class Counsel reasonable additional discovery as may be necessary to confirm the material representations made by Comcast which form the basis of this settlement, and the Parties shall cooperate in seeking third-party discovery as may also be necessary, provided that all confirmatory discovery shall be completed prior to the Fairness Hearing.

**B.    Notices**

Any notice, instruction, application for Court approval or application for Court orders sought in connection with this Agreement, or any document to be given by any Party to any other

Party shall be in writing and delivered personally or sent by registered or certified mail, postage

prepaid, to Class Counsel at the following address:

Mark N. Todzo
Lexington Law Group LLP
1627 Irving Street
San Francisco, CA 94122

and to Comcast's counsel at the following address:

Seamus C. Duffy
Drinker Biddle and Reath LLP
One Logan Square, 18th & Cherry Sts.
Philadelphia, PA 19103-6996

**C.    Execution**

This Agreement may be executed by facsimile or email signatures in multiple

counterparts, each of which shall be deemed an original and all of which, when taken together,

shall constitute one and the same valid and binding agreement.

**IN WITNESS WHEREOF**, each of the Parties hereto has caused this Agreement to be

executed on its behalf by its duly authorized counsel of record, all as of the day set forth below.

Plaintiff Jon Hart and the Releasing Parties:

By: _____
Mark N. Todzo

Dated: _____4/13_____, 2009

Comcast Corporation and the Released Parties:

By: _____
Seamus C. Duffy

Dated: _____4/13_____, 2009

SETTLEMENT AGREEMENT – PAGE 35 OF 35

EXHIBIT "C"                                                                    35